In the

# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 14-1470, -1471, -1658

SCOTT D.H. REDMAN, individually and on behalf of all
others similarly situated, *et al.*,

*Plaintiffs-Appellees*,

*v.*

RADIOSHACK CORPORATION,

*Defendant-Appellee*.

APPEAL OF: MICHAEL ROSMAN, *et al.*,

*Objectors*.

_____

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 C 6741 — **Maria G. Valdez**, *Magistrate Judge*.

_____

No. 14-1320

SULEJMAN NICAJ,

*Plaintiff-Appellant*,

*v.*

SHOE CARNIVAL, INCORPORATED,

*Defendant-Appellee*.

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13 C 7793 — **Thomas M. Durkin**, *Judge.*

———————————

ARGUED SEPTEMBER 8, 2014 — DECIDED SEPTEMBER 19, 2014

———————————

Before WOOD, *Chief Judge*, and POSNER and HAMILTON,
*Circuit Judges*.

POSNER, *Circuit Judge*. We have consolidated for decision
appeals in two class actions filed under the Fair and Accurate Credit Transactions Act ("FACTA"), 15 U.S.C.
§ 1681c(g). The Act provides, so far as relates to these cases,
that "no person that accepts credit cards or debit cards for
the transaction of business shall print [electronically, as distinct from by handwriting or by an imprint or copy of the
card] more than the last 5 digits of the card number *or the
expiration date* upon any receipt provided to the cardholder
at the point of the sale or transaction." §§ 1681c(g)(1), (2)
(emphasis added). The present cases concern the expiration
date. The idea behind requiring its deletion is that, should
the cardholder happen to lose the receipt of a transaction,
the less information the receipt contains the less likely is an
identity thief who happens to come upon the receipt to be
able to figure out the cardholder's full account information
and thus be able to make purchases that the seller will think
were made by the legitimate cardholder.

A typical credit card has 16 digits and an expiration date
that is the last day of a designated month and year. Even if

the identity thief has all 16 digits, without the expiration date he may be unable to use the card. He can of course guess at the expiration date—the date is unlikely to be more than a few years in the future and there are only 12 months in a year; so if he guesses 60 times he's very likely to hit the jackpot. But if he guesses wrong the first few times that he places an order, the card issuer may well get suspicious and refuse to authorize his next order. See, e.g., D. Lee, "Nine Reasons Your Credit Card Was Declined," *Fox Business*, May 21, 2013, www.foxbusiness.com/personal-finance/2013/05/21 /nine-reasons-your-credit-card-was-declined/ (visited Sept. 12, 2014, as were the other websites cited in this opinion). It's common in telephone and internet transactions for the consumer to be asked for an expiration date, and most systems will not allow the would-be customer to keep guessing at the date, as the guessing suggests that he may be an identity thief.

Additional reasons for requiring deletion of the expiration date include that "expiration dates combined with the last four or five digits of an account number can be used to bolster the credibility of a criminal who is making pretext calls to a card holder in order to learn other personal confidential financial information. Expiration dates are solicited by criminals in many e-mail phishing scams …, are one of the personal confidential financial information items trafficked in by criminals …, are described by Visa as a special security feature …, [and] are one of the items contained in the magnetic stripe of a credit card, so it is useful to a criminal when creating a phony duplicate card." Don Coker, "Credit Card Expiration Dates and FACTA," *HGExperts.com*, www.hgexperts.com/article.asp?id=6665.

If a violation of the statute is willful, a consumer whose receipt contains as a result of the violation data that should have been deleted, but who sustains no harm because no one stole his identity as a result of the violation, is nevertheless entitled to "statutory damages," as distinct from compensatory or punitive damages, of between $100 and $1000. 15 U.S.C. § 1681n(a)(1)(A). (Statutory damages are in effect bounties—means of inducing private persons to enforce a regulatory law.) In contrast, a consumer harmed by the violation of the statute can obtain actual damages by showing that the violation was the result of negligence, § 1681o; he need not prove willfulness.

To act "willfully" is, for purposes of civil law, to engage in conduct that creates "an unjustifiably high risk of harm that is either known or so obvious that it should be known," *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)—reckless conduct, in other words, as held in *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 56–60 (2007), but reckless conduct in the civil sense. Criminal recklessness is generally held to require "knowledge of a serious risk to another person, coupled with failure to avert the risk though it could easily have been averted," *Slade v. Board of School Directors*, 702 F.3d 1027, 1029 (7th Cir. 2012); see also *Black's Law Dictionary* 1298–99 (Bryan A. Garner ed., 8th ed. 2004), "whereas in civil cases at common law it is enough that the risk, besides being serious and eminently avoidable, is obvious; it need not be known to the defendant." *Slade v. Board of School Directors*, *supra*, 702 F.3d at 1029.

The known or obvious risk in this case would be failing to delete the expiration date on the consumer's credit-card or debit-card purchase receipt, whereas to be guilty merely of

negligence it would be enough that a reasonable person would have deleted it. See *Wassell v. Adams*, 865 F.2d 849, 855 (7th Cir. 1989).

Willfulness is an issue in both our cases. But it is a peripheral issue in the RadioShack case, while it is the primary issue in our other case, the Shoe Carnival case. Although both are class action suits, the district court in *Shoe Carnival* dismissed the suit with prejudice before certifying a class; there are no issues in that case concerning class action procedure. (The defendant could have sought class certification in order to prevent future similar suits by other class members, but did not.) *RadioShack*, in contrast, is centrally about class action procedure. The parties settled and the district court approved the settlement, and the appeal is by class members who objected to the approval. We begin with that case but defer discussion of the willfulness issue in it to later, when we take up the appeal in *Shoe Carnival*.

RadioShack Corporation is a large, well-known retail purveyor mainly of consumer electronics, cell phones, and related consumer products such as batteries, see "RadioShack," *Wikipedia*, http://en.wikipedia.org/wiki/RadioShack, sold mainly in RadioShack's thousands of stores rather than online. The class action suit was filed on behalf of consumers who bought products at RadioShack stores, paid with credit or debit cards, and received electronically printed receipts that contained the card's expiration date. The suit was filed in September 2011. In May 2013, before any substantive motions had been decided, the named plaintiffs (realistically, class counsel) agreed with RadioShack on terms of settlement. The essential term was that each class member who responded positively to the notice of the pro-

posed settlement would receive a $10 coupon that it could use at any RadioShack store. The class member could use it to buy an item costing $10 or less (but he would receive no change if the item cost less than $10), or as part payment for an item costing more. He could stack up to three coupons (if he had them) and thus obtain a $30 item, or a $30 credit against a more expensive item. He could also sell his coupon or coupons, but the coupons had to be used within six months of receipt because they would expire at the end of that period.

With regard to three-coupon stacking, the only way a member of the class could obtain more than a single coupon would be to buy one or more coupons from another class member, because the settlement allows only one coupon per customer no matter how many of his or her RadioShack purchases involved the erroneous receipts (in itself an arbitrary restriction on the value of the settlement to class members). But coupons may be difficult to buy. The owner would be reluctant to sell it for less than $10, as that would mean selling at a loss, but no sane person would pay more because a $10 coupon is worth only $10. Doubtless some owners, however, will sell because they don't plan to use the coupon or have no interest in a product that doesn't cost less than $10. Those owners are potential sellers. Nevertheless the secondary market in coupons is bound to be thin because of the paucity of coupons, the short expiration date, the limit to three per transaction (so people who want big-ticket items won't find the secondary market attractive as a source of coupons), and the bother of going online to buy $10 coupons at small discounts.

Although the class was assumed to contain 16 million members, notice of the proposed settlement was sent to fewer than 5 million. Actually no one can be sure whether the 16 million transactions involved 8 million different consumers, 12 million, or any other number, because of the one-coupon-per-person restriction. This may be a reason why the settlement administrator notified only about 5 million RadioShack consumers, though cost may have been the primary reason.

Of those potential class members who received notice of the proposed settlement, some 83,000 (we'll assume for simplicity that it was exactly 83,000)—a little more than one half of one percent of the entire class, assuming the entire class really did consist of 16 million different consumers—submitted claims for the coupon in response. The magistrate judge's statement that "the fact that the vast majority of class members—over 99.99%—have not objected to the proposed settlement or opted out suggests that the class generally approves of its terms and structure" is naïve, as is her basing confidence in the fairness of the settlement on its having been based on "arms-length negotiations by experienced counsel." The fact that the vast majority of the recipients of notice did not submit claims hardly shows "acceptance" of the proposed settlement: rather it shows oversight, indifference, rejection, or transaction costs. The bother of submitting a claim, receiving and safeguarding the coupon, and remembering to have it with you when shopping may exceed the value of a $10 coupon to many class members. And "arm's-length negotiations" are consistent with the existence of a conflict of interest on the part of one of the negotiators—class counsel—that may warp the outcome of the negotiations. The magistrate judge's further reference to "the considerable portion of class members who have filed claims"

questionably treats one-half of one percent as being a "considerable portion."

Another term of the proposed settlement was that RadioShack would pay class counsel $1 million (reduced by the district court to $990,291.88, but we'll round it off to $1 million for simplicity) in attorneys' fees, plus pay various administrative costs including the cost of notice. The agreed-upon attorneys' fees, plus the $830,000 worth of coupons at face value, plus the administrative costs, add up to about $4.1 million. Class counsel argued that since the attorneys' fees were only about 25 percent of the total amount of the settlement, they were reasonable. The district court, agreeing, approved the settlement, precipitating this appeal by two groups of class members who objected to the settlement in the district court.

A trial judge's instinct, in our adversarial system of legal justice, is to approve a settlement, trusting the parties to have negotiated to a just result as an alternative to bearing the risks and costs of litigation. But the law quite rightly requires more than a judicial rubber stamp when the lawsuit that the parties have agreed to settle is a class action. The reason is the built-in conflict of interest in class action suits. The defendant (as RadioShack's lawyer candidly admitted at the oral argument) is interested only in the bottom line: how much the settlement will cost him. And class counsel, as "economic man," presumably is interested primarily in the size of the attorneys' fees provided for in the settlement, for those are the only money that class counsel, as distinct from the members of the class, get to keep. The optimal settlement from the joint standpoint of class counsel and defendant, assuming they are self-interested, is therefore a sum of money

moderate in amount but weighted in favor of attorneys' fees for class counsel. Ordinarily—in this case dramatically—individual members of the class have such a small stake in the outcome of the class action that they have no incentive to monitor the settlement negotiations or challenge the terms agreed upon by class counsel and the defendant.

True, there is always a named plaintiff—a member of the class (sometimes several members) listed as the plaintiff in the case filings—because there is no civil suit without a plaintiff. But often (though we were told at argument not in this case) the named plaintiff is the nominee of class counsel, and in any event he is dependent on class counsel's good will to receive the modest compensation ($5,000 in this case) that named plaintiffs typically receive.

The judge asked to approve the settlement of a class action is not to assume the passive role that is appropriate when there is genuine adverseness between the parties rather than the conflict of interest recognized and discussed in many previous class action cases, and present in this case. See, e.g., *Eubank v. Pella Corp.*, 753 F.3d 718, 720 (7th Cir. 2014); *Staton v. Boeing Co.*, 327 F.3d 938, 959–61 (9th Cir. 2003); *In re GMC Pick–Up Truck Fuel Tank Products Liability Litigation,* 55 F.3d 768, 801, 819–20 (3d Cir. 1995). Critically the judge must assess the value of the settlement to the class and the reasonableness of the agreed-upon attorneys' fees for class counsel, bearing in mind that the higher the fees the less compensation will be received by the class members. When there are objecting class members, the judge's task is eased because he or she has the benefit of an adversary process: objectors versus settlors (that is, versus class counsel and the defendant).

Unfortunately the magistrate judge in approving the settlement in *RadioShack* failed to analyze the issues properly. Let's begin with the value of the award to the class members. The judge accepted the settlors' contention that the defendant's entire expenditures should be aggregated in determining the size of the settlement; it was this aggregation that reduced the award of attorneys' fees to class counsel to a respectable-seeming 25 percent. But the roughly $2.2 million in administrative costs should not have been included in calculating the division of the spoils between class counsel and class members. Those costs are part of the settlement but not part of the value received from the settlement by the members of the class. The costs therefore shed no light on the fairness of the division of the settlement pie between class counsel and class members.

Of course without administration and therefore administrative costs, notably the costs of notice to the class, the class would get nothing. But also without those costs class counsel would get nothing, because the class, not having learned of the proposed settlement (or in all likelihood of the existence of a class action), would have derived no benefit from class counsel's activity. And without reliable administration the defendant will not have the benefit of a valid and binding settlement. Yet although the administrative costs benefit class counsel and the defendant as well as the class members, the district court's fee award incorrectly treated every penny of administrative expense as if it were cash in the pockets of class members. By doing so the court eliminated the incentive of class counsel to economize on that expense—and indeed may have created a perverse incentive; for higher administrative expenses make class counsel's

proposed fee appear smaller in relation to the total settlement than if those costs were lower.

We are mindful that in *Staton v. Boeing Co.*, *supra*, 327 F.3d at 975, the Ninth Circuit said that "where the defendant pays the justifiable cost of notice to the class—but not, as here, an excessive cost—it is reasonable (although certainly not required) to include that cost in a putative common fund benefiting the plaintiffs for all purposes, including the calculation of attorneys' fees." The reason the court gave was that notice is a benefit to the class. The court overlooked the fact that it is also a benefit to class counsel. And in this case the administrative costs taken into account by the magistrate judge in determining the "fairness" of the attorneys' fee award were not limited to costs of notice to the class.

The ratio that is relevant to assessing the reasonableness of the attorneys' fee that the parties agreed to is the ratio of (1) the fee to (2) the fee plus what the class members received. At most they received $830,000. That translates into a ratio of attorneys' fees to the sum of those fees plus the face value of the coupons of 1 to 1.83, which equates to a contingent fee of 55% ($1,000,000 ÷ ($1,000,000 + $830,000)). Computed in a responsible fashion by substituting actual for face value, the ratio would have been even higher because 83,000 $10 coupons are not worth $830,000 to the recipients. Anyone who buys an item at RadioShack that costs less than $10 will lose part of the value of the coupon because he won't be entitled to change. Anyone who stacks three coupons to buy an item that costs $25 will lose $5. Anyone who fails to use the coupon within six months of receiving it will lose its entire value. (Six-month coupons are not unusual, but redemption periods usually are longer. See, e.g., *In re Mexico Money*

*Transfer Litigation (Western Union & Valuta)*, 164 F. Supp. 2d 1002, 1010–11 (N.D. Ill. 2000) (35 months); *Henry v. Sears Roebuck & Co.*, 1999 WL 33496080, at *10 (N.D. Ill. 1999) (nearly three years).) Anyone who sells his coupon will get less than the coupon's face value. Some recipients of coupons will lose them or forget about them. The chipping away at the nominal value of the settlement by the numerous restrictions imposed in the settlement agreement echoes the even more egregious such chipping away that we encountered in *Eubank v. Pella, supra*, 753 F.3d at 724–26.

No attempt was made by the magistrate judge or the parties to the proposed settlement to estimate the actual value of the nominal $830,000 worth of coupons. Couponing is an important retail marketing method, and one imagines that it would have been possible to obtain expert testimony (including neutral expert testimony by the court's appointing an expert, as authorized by Fed. R. Evid. 706), or responsible published materials, on consumer response to coupons. And likewise it should have been possible to estimate the value of couponing to sellers—a marketing device that in some circumstances must be more valuable than cutting price, as otherwise no retailer would go to the expense of buying and distributing coupons. In fact couponing is believed to confer a number of advantages on a retail seller (which RadioShack is):

> Regular use of good couponing strategy will provide a steady stream of new customers and high quality sales leads. … Coupons have the effect of expanding or increasing your market area. We know that consumers will travel far to redeem a valuable coupon. Coupons will entice new customers that have been shopping at your competitor. It's a proven fact that consumers will

> break routine shopping patterns to take advantage of a good coupon offer. Coupons attract new residents when they are actively in the market for products and services. … Coupons will re-activate old customers. Those customers that have been lured away by your competitor will start buying from you again when you give them a good reason to do so. … Coupon advertising provides the opportunity for additional profits through sale of related items. … When you offer a special "deal" on a coupon to invite a customer to do business with you, you have to remember that this same customer will probably end up buying additional items that carry a full profit margin. In addition, you also are being given the opportunity to "sell-up" to a more profitable product or service. You would not have had this opportunity had it not been for the coupon getting the customer through the door in the first place. Coupons build store traffic which results in additional impulse purchases. Coupons are measurable and accountable. … It's simply a matter of counting the number of coupons redeemed to judge the effectiveness of the offer. Wise use of this consumer feedback will guide you in creating future offers that improve your results.

Thom Reece, "How to Use Coupons to Promote Your Business," *business know-how*, www.businessknowhow.com/marketing/couponing.htm.

Another way in which couponing benefits a firm in RadioShack's position is that it costs the seller only the wholesale price of a product bought by a customer with a coupon in order to give the customer a retail benefit. RadioShack is out of pocket only the wholesale price of a $10 item bought with a coupon; it would have been out a full $10 had the set-

tlement required it to pay class members in cash. True, there are administrative costs in processing coupon transactions, but there are such costs in processing cash transactions as well. And while were there no coupons there would be more cash sales, at full retail price, coupon selling must be advantageous for sellers relative to price cuts or else it wouldn't be as common as it is.

To the extent that couponing would thus benefit RadioShack, it reduces the cost of the proposed settlement and therefore the likelihood that it would endanger the company's solvency. That's fine, as we're about to see, because RadioShack appears to be teetering on the brink of insolvency and if it goes over the brink the value of the coupons may be drastically impaired. But while we don't know how much $830,000 of coupons would be worth to the class, we can be confident that it would be less than that nominal amount, doubtless considerably so. And we note that were the value only $500,000—and it may indeed be no greater—the agreed-upon attorneys' fee award would be the equivalent of a 67 percent contingency fee.

One possible solution, in a case in which the agreed-upon attorneys' fee is grossly disproportionate to the award of damages to the class, is to increase the share of the settlement received by the class, at the expense of class counsel. Another possible solution is to jack up the award of damages, in this case for example from $830,000 to $2 million (cash, not coupons), while leaving the fee award at $1 million. The administrative costs might also be increased, specifically by increasing the number of class members notified of the settlement, in order to give more class members a slice of the

pie. The total cost of the settlement might rise from $4.1 million to say $6 million.

But here's the rub, regarding the second suggested adjustment in the settlement, the adjustment that increases the size of the settlement rather than its division between class counsel and class members: RadioShack is in terrible financial shape. Recently Moody's reduced the company's credit rating to Caa2 ("rated as poor quality and very high credit risk"). Moody's Investor Service, "Rating Action: Moody's Downgrades RadioShack's CFR to Caa2; Outlook Remains Negative," May 5, 2014, www.moodys.com /research/Moodys-downgrades-RadioShacks-CFR-to-Caa2-o utlook-remains-negative--PR_294298. See also Will Ashworth, "RadioShack Stock—Cue the Comeback? RSH Doled Out a Doubler Within a Week, But How Real Are RadioShack's Survival Chances?," *InvestorPlace*, Sept. 2, 2014, http://investorplace.com/2014/09/radioshack-stock-rsh-come back/#.VA9IrvldUnU. An article by William Alden ominously entitled "RadioShack Sees Filing for Bankruptcy Near" was published just last week in the *New York Times*, Sept. 12, 2014, p. B3.

Adding millions to the cost of the settlement to RadioShack might, if not precipitate the company's failure, make it more likely—an outcome that might leave very little for the class members. A modest settlement is the prudent course. And a coupon settlement has the virtue of boosting RadioShack's business, since as we've noted couponing is a marketing device that must sometimes be more effective than an equivalent price cut. So even if the proposed settlement of $830,000 in coupons is worth a good deal less than face value and is therefore modest relative to a potential

class of millions of consumers, we think it was adequate in the parlous circumstances in which the defendant finds itself. But that is not to say that the $1 million attorneys' fee is reasonable; and if it were cut down the amount saved could be reallocated to the class, thereby increasing the meager value of the settlement to the class members. That was the first possible modification that we mentioned: changing the relative shares of the settlement received by class counsel and class members without increasing the amount of the settlement.

The magistrate judge based the fee award on the amount of time that class counsel reported putting in on the case, but increased the amount so calculated by 25 percent to reflect the risk created by the possibility that the suit would fail—that, for example, RadioShack might be able to refute an inference of willfulness. But the reasonableness of a fee cannot be assessed in isolation from what it buys. Suppose class counsel had worked diligently—as hard and efficiently as they say they worked—but only a thousand claims had been filed in response to notice of the proposed settlement, so that the total value of the class, even treating a $10 coupon as the equivalent of a $10 bill, was only $10,000. No one would think a $1 million attorneys' fee appropriate compensation for obtaining $10,000 for the clients, even though a poor response to notice is one of the risks involved in a class action. In the present case, similarly though less dramatically, the efforts of class counsel yielded an extremely modest harvest, the value of which the district court made no effort to assess, instead assuming unjustifiably that a $10 coupon is worth $10 to every recipient.

Our response is the same to class counsel's further argument that had the case gone to trial the defendant might have won because a jury might decide that the defendant's violation of the Fair and Accurate Credit Transactions Act had not been willful. We'll be discussing the application of the Act's concept of willfulness in connection with our other case; suffice it to note here that, as we've explained, attorneys' fees don't ride an escalator called risk into the financial stratosphere. Some cases should not be brought, because the litigation costs will exceed the stakes, and others are such long shots that prudent counsel will cut his expenditure in litigating them of time, effort, and money to the bone. Neither course was followed by class counsel in this case. But, as it happened, RadioShack's violation probably *was* willful, as we'll see.

We have emphasized that in determining the reasonableness of the attorneys' fee agreed to in a proposed settlement, the central consideration is what class counsel achieved for the members of the class rather than how much effort class counsel invested in the litigation. But in thus emphasizing value over cost we may seem to be taking sides in a controversy over the interpretation of the coupon provisions of the Class Action Fairness Act, in particular 28 U.S.C. §§ 1712(a) and (b)(1), which read as follows:

> (a) *Contingent Fees in Coupon Settlements*. If a proposed settlement in a class action provides for a recovery of coupons to a class member, the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class members of the coupons that are redeemed.

> (b) *Other Attorney's Fee Awards in Coupon Settlements*. (1) In general. If a proposed settlement in a class action

> provides for a recovery of coupons to class members, and a portion of the recovery of the coupons is not used to determine the attorney's fee to be paid to class counsel, any attorney's fee award shall be based upon the amount of time class counsel reasonably expended working on the action.

This is a badly drafted statute. To begin with, read literally the statutory phrase "value to class members of the coupons that are redeemed" would prevent class counsel from being paid in full until the settlement had been fully implemented. For until then one wouldn't know how many coupons had been redeemed. An alternative interpretation of "value … of the coupons that are redeemed" would be the face value of the coupons received by class members who responded positively to notice of the class action. In this case that would be 83,000 of the millions of class members who received notice, though not all 83,000 will actually use the coupon.

A thoughtful article, after pointing out that "in many situations … it may not be possible or desirable to wait for actual redemption rates to become known" before a coupon class action is settled, nevertheless reads the statutory language "value … of the coupons that are redeemed" literally and so is driven to suggest complicated methods, which would require amending the Class Action Fairness Act, for valuing a coupon settlement without delaying implementation of the settlement indefinitely. Robert H. Klonoff & Mark Hermann, "The Class Action Fairness Act: An Ill-Conceived Approach to Class Settlements," 80 *Tulane L. Rev.* 1695, 1701–02 (2006). This interpretation of section 1712(a) is, however, in some tension with section 1712(d), which empowers the district court to "receive expert testimony from a witness

qualified to provide information on the actual value to the class members of the coupons that are redeemed." Such a witness could be asked to estimate the likely value of the coupons to the class members before the redemption period expires, and such evidence might provide a more efficient method of compensating the class members and winding up the litigation than waiting months or years for the redemption period to expire and then revising the settlement by giving the class members more or less, or class counsel more or less. Moreover, if the settlement can't be wound up until the redemption period expires, this places pressure on the district court to approve a short redemption period, as in this case—and the shorter the period, the less the value of the coupon. And finally "value" could mean estimated economic value of the settlement, rather than face value times number of coupons.

There is no need for a rigid rule—a final choice, for all cases, among the possibilities suggested. In some cases the optimal solution may be part payment to class members and class counsel up front with final payment when the settlement is wound up. That might be appropriate in a case such as this. What was inappropriate was an attempt to determine the ultimate value of the settlement before the redemption period ended without even an estimate by a qualified expert of what that ultimate value was likely to prove to be.

Another problem with section 1712 is that while subsection (a) is mandatory—under it the attorneys' fee in a coupon settlement *must* be based on the coupons' redemption value—subsection (b)(1) provides an alternative method of determining attorneys' fees in such a case: "the amount of time class counsel reasonably expended working on the ac-

tion"—what is called, in an opaque bit of legal jargon, the "lodestar method" of calculating fee awards for class counsel.

*In re HP Inkjet Printer Litigation*, 716 F.3d 1173, 1183–84 (9th Cir. 2013), held (with one judge dissenting) that subsection (b)(1) is limited to cases in which the settlement provides both coupon and cash benefits to the class members— whe there are just coupons subsection (a) *must* be used. The reasoning is that coupon redemption value can't be the sole basis for calculating a reasonable attorneys' fee for class counsel if coupons are not the only benefit to the class, but can be if they are the only benefit. This interpretation reflects the suspicion of coupon settlements (the basis of the suspicion being well illustrated by this case) that was the motivation for the coupon provisions of the Act. We need not complicate this opinion further by taking sides in *HP Inkjet*. The important thing is that the district court should be alert to the many possible pitfalls in coupon settlements—pitfalls that moved Congress to amend the Class Action Fairness Act with specific reference to such settlements.

It wouldn't make much difference—maybe it wouldn't make any—if the district court could use the approach of subsection (b)(1) even in all-coupon case like this. The reason is that hours can't be given controlling weight in determining what share of the class action settlement pot should go to class counsel. The judge could start with hours but couldn't rightly stop there. The analogy to hourly billing by law firms fails because law firms bill clients who have agreed to be billed on that basis. Class counsel don't have clients with whom they negotiate billing. Class members do not tell class counsel how much time to expend on a case and how much

they can charge per hour. The stakes for an individual class member are typically (as in this case) too slight to induce him to participate actively in the litigation. Class counsel's billing rate and maximum billable hours have to be determined by the court in reviewing the terms of the proposed settlement of the class action. And in that review the amount of the class settlement allocable to class counsel should depend critically on the value of class counsel's work to the class.

Suppose that after working diligently for many days—an amount of work for which normally they would charge a client $1 million—class counsel discovered that the expected value of the litigation (the most reliable predictor of what a judge or jury would award as damages and an appellate court uphold) was $1.1 million, and on that basis they settled the suit with the defendant for that amount. It would be absurd to approve a settlement that awarded class counsel ten times the damages awarded the class ($100,000 in the example), on the basis of "the amount of time class counsel reasonably expended working on the action," even if the expenditure was "reasonable" given what class counsel reasonably but mistakenly had thought the case worth to the class. For that would be a settlement in which class counsel had been able to shift the entire risk of the litigation to their clients.

Analysis is more complex when the principal benefits of the settlement are nonmonetary, as when equitable relief is awarded rather than damages. A value must be attached to the relief obtained by the class as part of the determination of an appropriate attorneys' fee for class counsel, but a rough estimate may be permissible, especially when, as in

civil rights cases, much of the value of the equitable relief may be nonmonetizable.

We have called this case an "all-coupon" case but class counsel call it a "zero-coupon" case. They say that a coupon that can be used to buy an entire product, and not just to provide a discount, is a voucher, not a coupon. "Voucher" is indeed the term used in the settlement agreement, because the parties didn't want to subject themselves to the coupon provisions of the Class Action Fairness Act. But the idea that a coupon is not a coupon if it can ever be used to buy an entire product doesn't make any sense, certainly in terms of the Act. Why would it make a difference, so far as the suspicion of coupon settlements that animates the Act's coupon provisions is concerned, that the proposed $10 coupon could be used either to reduce by $10 the cash price of an item priced at more than $10, or to buy the entire item if its price were $10 or less? Coupons usually are discounts, but if the face value of a coupon exceeds the price of an item sold by the issuer of the coupon, the customer often is permitted to use the coupon to buy the item—and sometimes he'll be refunded the difference between that face value and the price of the item. See, e.g., "Coupons: What Are They and Where Do I Start?," *Penny Pinchin' Mom,* www.pennypinchinmom.com /getting-started-on-penny-pinchin-mom/coupons-what-are-they-and-where-do-i-star/.

That is the character of RadioShack's proposed coupons: they can be used either to buy entire items priced up to $10 (though without a refund of any difference between the face value of the coupon and the price of the item bought with it) or to obtain a discount on a pricier item. There are no data on how often a $10 coupon would be used in a RadioShack

store to buy an item costing $10 or less rather than to obtain a discount on a pricier item. But it's unlikely that a buyer would use a coupon to buy an item costing less than $10, since the buyer would receive no change. And we are not told how many items in the typical RadioShack store cost exactly $10. (For items that cost more, the coupon is a discount.) We are told that 6000 different products sold by RadioShack are priced at $10 or less, out of some 20,000 different RadioShack products advertised in an online catalog. See *RadioShack—Do It Together*, www.google.com/?gws_rd=ss l#q=RadioShack%20products&nfpr=1&start=0. But we are not told how many of each of the low-priced products the average RadioShack store carries. But it is apparent that the products are actively promoted and presumably most in demand by consumers are on average more expensive than $10. See, e.g., *Weekly Electronics Deals and Discounts*, www.ra dioshack.com/category/index.jsp?categoryId=41803466. And this means that even if "coupon" is narrowly defined to mean a discount, RadioShack's coupons are mainly coupons in just that narrow sense, and only occasionally vouchers.

In any event the narrow sense is untenable. As we said before, from the standpoint of the dominant concerns that animate the provisions of the Class Action Fairness Act regarding coupon settlements it's a matter of indifference whether the coupon is a discount off the full price of an item or is equal to (or for that matter more than) the item's full price. The Senate Report on the coupon provisions, S. Rep. No. 109-014, pt. IV.D.1 (Lawyers Receive Disproportionate Shares of Settlements), https://beta.congress.gov/109/crp t/srpt14/CRPT-109srpt14.pdf., at pp. 15–20, does not define coupon, but treats the term as interchangeable with "voucher, " *id*. at 16, and evinces no wish to treat vouchers differ-

ently from coupons in the evaluation of a proposed class action settlement.

Class counsel point out that elsewhere in the legislative history concern is expressed with settlements that compel class members to spend more money with the defendant if they want to benefit from the settlement, as is the case with a discount, but not with a voucher that is simply exchanged for an item so that no cash changes hands. But this was not Congress's only concern, as shown by the Senate Report just cited, which, as we pointed out, in documenting the abuses of coupon settlements does not give "coupon" the narrow definition urged by class counsel.

This case illustrates *why* Congress was concerned that class members can be shortchanged in coupon settlements whether a coupon is used to obtain a discount off the full price of an item or to obtain the entire item; we have noted the ways in which store credit for $10 is not as valuable to the recipient as $10 in cash. Class counsel's proposed distinction between discount coupons and vouchers also would impose a heavy administrative burden in distinguishing coupons used for discounts on more expensive items ("coupons" in class counsel's narrow sense of coupon) and the identical coupons used to pay the full prices of cheaper items ("vouchers" in class counsel's lexicon and not "coupons" at all). Class counsel *trumpet* the 6000 items that class members can buy with just the coupon—namely any product that costs $10 or less. As the present case illustrates, assessing the reasonableness of attorneys' fees based on a coupon's nominal face value instead of its true economic value is no less troublesome when the coupon may be exchanged for a full product. There is in short no statutory or practical

reason for distinguishing among coupons that offer 10 percent, 50 percent, 90 percent, or 100 percent cash savings.

The difficulty of valuing a coupon settlement exposes another defect in the proposed settlement: placing the fee award to class counsel and the compensation to the class members in separate compartments. The $1 million attorneys' fee is guaranteed, while the benefit of the settlement to the members of the class depends on the value of the coupons, which may well turn out to be much less than $830,000. This guaranty is the equivalent of a contingent-fee contract that entitles the plaintiff's lawyer to the first $50,000 of the judgment or settlement plus one-third of any amount above $50,000—so if the judgment or settlement were for $100,000 the attorneys' fee would be $66,667, leaving only a third of the combined value (to plaintiff and lawyer) of the settlement to the plaintiff.

Another questionable feature of the settlement is the inclusion of a "clear-sailing clause"—a clause in which the defendant agrees not to contest class counsel's request for attorneys' fees. Because it's in the defendant's interest to contest that request in order to reduce the overall cost of the settlement, the defendant won't agree to a clear-sailing clause without compensation—namely a reduction in the part of the settlement that goes to the class members, as that is the only reduction class counsel are likely to consider. The existence of such clauses thus illustrates the danger of collusion in class actions between class counsel and the defendant, to the detriment of the class members.

As explained (with copious references to both judicial and academic sources) in William D. Henderson, "Clear Sailing Agreements: A Special Form of Collusion in Class Action

Settlements," 77 *Tulane L. Rev.* 813 (2003), clear-sailing clauses are found mainly in cases such as the present one in which the value of the settlement to the class members is uncertain because it is not a cash settlement. This complicates the difficulty faced by the district court in determining an appropriate attorneys' fee, and a clear-sailing clause exacerbates the difficulty further by eliminating objections to an excessive fee by the defendant. Clear-sailing clauses have not been held to be unlawful per se, but at least in a case such as this, involving a non-cash settlement award to the class, such a clause should be subjected to intense critical scrutiny by the district court; in this case it was not.

There is still more wrong with the settlement. Rule 23(h) of the civil rules requires that a claim for attorneys' fees in a class action be made by motion, and "notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner." Class counsel did not file the attorneys' fee motion until after the deadline set by the court for objections to the settlement had expired. That violated the rule. *In re Mercury Interactive Corp. Securities Litigation*, 618 F.3d 988, 993–95 (9th Cir. 2010); see also Committee Notes on the 2003 Amendments to Rule 23. From reading the proposed settlement the objectors knew that class counsel were likely to ask for $1 million in attorneys' fees, but they were handicapped in objecting because the details of class counsel's hours and expenses were submitted later, with the fee motion, and so they did not have all the information they needed to justify their objections. The objectors were also handicapped by not knowing the rationale that would be offered for the fee request, a matter of particular significance in this case because of the invocation of administrative costs as a factor warranting in-

creased fees. There was no excuse for permitting so irregular, indeed unlawful, a procedure.

A final concern with the settlement involves the lead named plaintiff, Scott Redman. He is employed by a law firm for which the principal class counsel, Paul Markoff and Karl Leinberger, once worked. "The named plaintiffs are the representatives of the class—fiduciaries of its members—and therefore charged with monitoring the lawyers who prosecute the case on behalf of the class (class counsel)." *Eubank v. Pella*, *supra*, 753 F.3d at 719. There ought therefore to be a genuine arm's-length relationship between class counsel and the named plaintiffs. We don't say there wasn't such a relationship in the present case, but we do wish to remind the class action bar of the importance of insisting that named plaintiffs be genuine fiduciaries, uninfluenced by family ties (as in *Eubank*) or friendships.

The magistrate judge, in approving the inadequate settlement proposal, may have been concerned with the cost of litigation to fragile RadioShack if the settlement was disapproved and the case had to be tried. But very few class actions are tried, see *id*. at 720, and this one would not have been an exception. RadioShack can't afford costly litigation, and class counsel can't afford to risk a delay in settling, lest RadioShack declare bankruptcy. A renegotiated settlement will simply shift some fraction of the exorbitant attorneys' fee awarded class counsel in the existing settlement that we are disapproving to the class members.

We come at last to our second case, *Shoe Carnival*, which pivots on the meaning of "willfully" in the Fair and Accurate Credit Transactions Act. The willfulness issue in *RadioShack* case was straightforward. The company had been found in

an earlier lawsuit to have left the expiration date on receipts in violation of a parallel state statute, see *Ferron v. RadioShack Corp*, 886 N.E.2d 286 (Ohio App. 2008), and apparently failed to take adequate precautions against repeating the violation, this time of the (materially identical) federal statute. By the time RadioShack discovered the mistake, 16 million unlawful receipts had been handed to its customers, as we know. The company had to know that there was a risk of error because the identical risk had materialized previously. Knowing the risk and failing to take any precaution against it— though a completely adequate precaution would have cost nothing—were indicative of willful violation.

That RadioShack's violation probably was willful underscores the meagerness of the settlement value to the class members. Class counsel—a handful of lawyers—divide up a million dollars, under the settlement that the district court approved, while a relative handful of class members (83,000 out of 16 million potential class members) receive only 10 cents on the dollar, since the coupon is only $10 even though the minimum statutory damages for a willful violation is $100. And 10 cents on the dollar is actually an exaggeration of the benefit of the settlement to the class, because the coupons are worth less in the aggregate than their face value. Yet as we also said, given RadioShack's parlous financial state it would be a mistake to increase the aggregate size of the settlement beyond its current $4.1 million ceiling. Our only concern therefore is the division of spoils between class counsel and class members. It seems apparent that each class member has a valid claim to a good deal more than one $10 coupon, and it would seem therefore that the equities favor a reallocation of some of what we are calling the spoils from class counsel to the class members who have submitted

claims for the coupons. We are mindful that recipients of statutory damages are not being compensated for actual injury, but in effect are being paid bounties to assist in efforts to reduce identity theft. But identity theft is a serious problem, and FACTA is a serious congressional effort to combat it.

The willfulness issue in *Shoe Carnival* is different from that in *RadioShack*. There was no previous violation to alert the company; and it is not argued that mistakes made by other credit‑card sellers should have alerted it to the risk of violating the statute inadvertently. And if there was a violation, it was not willful because it consisted of a permissible interpretation of an ambiguous statute. Cf. *Safeco Ins. Co. of America v. Burr*, *supra*, 551 U.S. at 68. Instead of omitting the entire expiration date from credit‑card receipts, Shoe Carnival omitted just the year; the month in which the credit card expired remained. Now "expiration date" is not a defined term in the statute. It could mean the month, day (if other than the last day of the month), and year in which the card expires, and it is arguable that if any of these are left out there's no actual expiration date on the receipt, just a fragment of such a date.

The first part of the statutory provision, dealing with the credit‑card number, is explicit that all the digits that make up the number need not be deleted to avoid a violation; the last five can remain. The second part of the provision, dealing with the expiration date, is not explicit. All that is clear is that "January," with no year, is not an expiration date; it's just part of such a date.

There wouldn't be any purpose, however, in allowing the seller to leave the month of expiration on the receipt. The

last five digits of the card number are permitted to remain so that in the event of a dispute with the card company or maker of the receipted sale, the customer's ownership of the card can be veritied; in addition, "printing any small subset of the digits on a card enables the customer to know which card was used for a particular purpose (that's why merchants want to print some of the digits), without enabling a stranger to learn the full number." *Van Straaten v. Shell Oil Products Co. LLC*, 678 F.3d 486, 490 (7th Cir. 2012). All that allowing the month to remain on the receipt does, however, is give an identity thief a datum that he may be able to use in conjunction with other data to determine the cardholder's identity, as when Merchant A prints the last 5 digits and the month, Merchant B prints the last 5 digits and the year, and Merchant C prints no dates inadvertently prints the entire credit card number—and an identity thief gains access to all three receipts. Though that's unlikely to happen, there is no upside to allowing the month to appear on the receipt; and so there is a persuasive argument for interpreting "expiration date" in the statute to mean "expiration date or any part thereof," as held in *Long v. Tommy Hilfiger U.S.A., Inc.*, 671 F.3d 371 (3d Cir. 2012), which noted that if part of the expiration date is allowed to remain on the receipt, and different sellers leave different parts of the expiration date on their receipts, a person who found different receipts for purchases by the same cardholder might learn the entire expiration date. This is why the statute permits the receipt to show only the *last* five digits of the card number—if it could show any five digits, an identity thief could reconstruct the entire number if he obtained multiple receipts of sales to the same cardholder.

There is, however, sufficient ambiguity attending the provision of the statute regarding the expiration date to justify the district court's determination that Shoe Carnival had not willfully violated FACTA. The interpretation of the statute advanced by the company was possible, indeed plausible, possibly even correct; and that is enough, as the district court held, to negate an inference of willfulness.

To conclude, the judgment approving the settlement in *RadioShack* (Nos. 14-1470, -1471, and -1658) is reversed and the case remanded to the district court for further proceedings consistent with this opinion. The judgment in favor of the defendant in *Shoe Carnival* (No. 14-1320) is affirmed.