In the

# United States Court of Appeals
### For the Seventh Circuit

---

No. 12-2930

CE DESIGN LTD. and PALDO SIGN AND DISPLAY CO., on
behalf of themselves and all others similarly situated,

*Plaintiffs-Appellees,*

*v.*

KING SUPPLY CO., LLC, doing business as KING
ARCHITECTURAL METALS, INC.,

*Defendant,*

VALLEY FORGE INSURANCE CO., *et al.*,

*Proposed Intervenors/Appellants.*

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 09 C 2057 — **Sidney I. Schenkier**, *Magistrate Judge.*

---

ARGUED MAY 27, 2015 — DECIDED JUNE 29, 2015

---

Before POSNER, MANION, and HAMILTON, *Circuit Judges.*

POSNER, *Circuit Judge.* This litigation began in 2009, when
CE Design filed a class action suit under the Telephone Consumer Protection Act, 47 U.S.C. § 227, against King Supply,

which removed the suit to the federal district court in Chicago. King Supply had been issued commercial general liability and commercial umbrella policies by three insurance companies, but upon its request for coverage they disclaimed any obligation to defend or indemnify their insured against CE Design's lawsuit. They based their disclaimer primarily on provisions in the insurance policies that appeared to exempt liability under the Telephone Consumer Protection Act from the policies' coverage.

The district court certified the class (consisting of recipients of advertising faxes from King Supply) and designated CE Design as class representative. We reversed the district court on the basis of various irregularities and remanded for further proceedings. *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721 (7th Cir. 2011). On remand, CE Design and its coplaintiff agreed with King Supply to settle the case for $20 million, the limit of the insurance policies. Their agreement, made in September 2011 and approved by the district court in July of the following year, provided that only 1 percent of the judgment ($200,000) could be executed against King Supply. The rest would have to come from the insurance policies. It appears that if forced to pay more than $200,000 King Supply would have had to declare bankruptcy.

Upon learning of the proposed settlement (but not of all its terms, which the parties had agreed not to reveal to the insurers—we don't understand the justification for such a provision, but it has no bearing on this appeal), the insurers filed a declaratory judgment action in Texas (King Supply's principal place of business and also where the insurance policies had been issued), disclaiming coverage. The suit was

dismissed for lack of jurisdiction over several of the parties, including CE Design, but a similar suit (though with the parties reversed) was filed in an Illinois state court and we were told at oral argument that that court has recently ruled that the insurance policies don't cover King Supply's liability under the Telephone Consumer Protection Act but that CE Design is appealing that decision.

In January 2012, after the settlement agreement in the present (the federal) case but before the district court approved it, the insurers moved to intervene in the case under Fed. R. Civ. P. 24(a) and (b). They hoped to persuade the district court to delay approval of the settlement until there was a state-court determination of whether they owed King Supply coverage, and also, if they failed to obtain a favorable determination in the state-court system, to persuade the district court (and if necessary our court on appeal) that the settlement was collusive and unreasonable and should therefore be rejected. The district court denied the motion to intervene as untimely. The insurers appeal.

The district court thought the insurers should have moved to intervene in 2009, when they had disclaimed coverage of the claims that King Supply, their insured, had violated the Telephone Consumer Protection Act. For the insurers knew or should have known by then, the court said, that the parties to the TCPA suit—CE Design and King Supply—were likely to negotiate a settlement that would place liability on the insurers. For King Supply couldn't afford more than the $200,000 that it agreed to pay the class out of its own pocket, and that left only the insurance policies as a source of compensation to the class—and neither class counsel nor the members of the class would care whose pocket

the settlement proceeds came out of. The insurers riposte that until they learned the terms of the settlement they had assumed their denial of coverage had taken them off the hook. And indeed, as we've noted, they've succeeded in persuading the Illinois trial court that their denial of coverage was justified. They don't propose to repeat in the federal proceeding their challenge to coverage; rather they seek intervention in order to challenge the settlement as improper because the amount—the $20 million—so greatly exceeds King Supply's ability to compensate the class (and class counsel), and also because it overstates the value of the plaintiffs' claims. The insurers argue that King Supply sold them down the river by failing to defend against class counsel's $20 million money grab. They say that at first King Supply had fought the class action suit and so they had no incentive to intervene (and incur legal fees). They argue in short that the settlement is improper because it is the product of betrayal by King Supply and because they were denied prompt disclosure of its terms.

This may seem a strange argument. A person or firm takes out insurance in order to shift liability for losses incurred if the insured risk materializes; the insurer is compensated for taking the risk off the insured's shoulders by the premiums that the insured pays to shift the risk. The insured might therefore be thought to have no duty to mitigate the risk assumed by the insurer (in this case, by incurring potentially heavy litigation costs to defend against being held liable to the involuntary recipients of its faxed solicitations, alleged to violate the Telephone Consumer Protection Act). But as well explained in Don R. Sampen & Alec M. Barinholtz, "Enforcement of Settlements between Insureds and Claimants," 35 *Insurance Litigation Reporter* 409 (2013),

"a growing phenomenon in insurance coverage-related litigation is the incidence of settlements reached between insureds and claimants without the participation of insurers. The settlements typically involve a stipulated judgment entered against the insured accompanied by a covenant not to execute against the insured given … by the claimant, and an agreement that the judgment is enforceable only against insurance proceeds. Such settlements give rise to several concerns by insurers, a major one being the lack of any real adversarial relationship between the insured and claimant after reaching the decision that the insurer will bear the full financial loss. The lack of adversity may lead to the negotiation of 'sweetheart' deals where the only effective checks on the amount of the settlement are: (a) the insurer's policy limits, if not disregarded by a finding of bad faith against the insurer, and (b) a court's determination that the settlement amount is reasonable." The result may be arbitrary redistributions of wealth from insurers to the plaintiffs who sued the insured, often with weak claims. The insurers in this case were right to worry that class counsel in the Telephone Consumer Protection Act class action suit and the defendant in that suit, King Supply, might collude to mulct the insurance company for an excessive recovery, favorable to the class and to class counsel and harmless to the class action defendant.

But they should have begun worrying when the suit was filed rather than almost three years later. Almost all class actions are settled, and as we've noted in recent cases a class action settlement may be the product of tacit collusion between class counsel and defendant. See, e.g., *Pearson v. NBTY, Inc.*, 772 F.3d 778, 786–87 (7th Cir. 2014); *Redman v. RadioShack Corp.*, 768 F.3d 622, 629 (7th Cir. 2014); *Eubank v. Pella Corp.*, 753 F.3d 718, 720 (7th Cir. 2014). The reason is

that the optimal settlement for these antagonists is one that awards large attorneys' fees to class counsel but modest damages to the class members, for then the overall cost of the settlement to the defendant is capped at a relatively modest level while the class counsel receive generous attorneys' fees. The class members receive little—but they have no control over the litigation or the terms of settlement. The twist in this case is that the defendant, King Supply, could afford to agree to a very generous settlement of the class claim because 99 percent of the cost (all but the $200,000) would be borne by its insurers rather than by it. The settlement would be generous to the class members as well as class counsel, but virtually harmless to the defendant.

The Supreme Court of Illinois has noted in such a case the insurer's argument "that, in settlement agreements such as the one at issue … the insured's own money is never at risk and, therefore, the insured has no incentive to contest liability or damages with the injured plaintiff. According to [the insurer], since the insured is essentially paying with the insurer's money, the insured can, and will, agree to any amount of damages the injured plaintiff requests." *Guillen ex rel. Guillen v. Potomac Ins. Co. of Illinois*, 785 N.E.2d 1, 13 (Ill. 2003). The court went on to rule that "with respect to the insured's decision to settle, the litmus test must be whether, considering the totality of the circumstances, the insured's decision 'conformed to the standard of a prudent *uninsured*.'" *Id*. at 14 (emphasis in original).

The insurers should have foreseen the danger of such a settlement from the outset; had they wished to challenge it on the ground that class counsel and King Supply were conspiring to overcompensate the class, they should have

moved to intervene at the outset of the litigation, not nearly three years later, when the settlement had been negotiated and was about to be presented to the district court for approval. At that late stage the only object of the intervention could be to block the settlement and put the class action suit back to where it had been in 2009. So gratuitous an extension of a multi-year litigation should not be encouraged.

From the get-go the insurers had reason to believe that the class action could well harm their interests, and Fed. R. Civ. P. 24(a) and (b) require that the motion to intervene be timely. It was not in this case, which had dragged on for years and would be doomed to drag on for additional years were the motion to be granted. A prospective intervenor must move to intervene as soon as it "knows or has reason to know that [its] interests might be adversely affected by the outcome of the litigation." *Sokaogon Chippewa Community v. Babbitt*, 214 F.3d 941, 949 (7th Cir. 2000). The insurers' motion to intervene in the federal litigation was untimely and therefore rightly denied. See *Larson v. JPMorgan Chase & Co.*, 530 F.3d 578, 583–84 (7th Cir. 2008).

Rather than intervene belatedly, the insurers might have been expected to exercise from the outset of the class action their right under the insurance policies to control and conduct the insured's (King Supply's) defense. Then they could have refused to agree to a settlement that cost them $20 million (minus $200,000). At argument their lawyer said they'd decided not to take over the defense because that would have required them to incur legal fees. Yet expending a few hundred thousand dollars on legal fees to defend against a possible loss of $20 million would have been a reasonable investment.

Granted, when the insurers moved to intervene they were in an awkward position. The district court had not decided whether to approve the settlement and the insurers were still at risk of losing the coverage dispute in the Illinois court system. Having denied coverage they couldn't control King Supply's defense, against its will, by intervening, for by denying coverage they had disclaimed any duty to indemnify King Supply, placing that company in an awkward position if the insurers controlled its defense; the insurers would have no skin in the game. So even if the insurers had filed a timely motion to intervene, their interest might well have been deemed too contingent on uncertain events to justify granting their motion. See, e.g., *Travelers Indemnity Co. v. Dingwell*, 884 F.2d 629, 638–39 (1st Cir. 1989); *Restor-A-Dent Dental Laboratories, Inc. v. Certified Alloy Products, Inc.*, 725 F.2d 871, 874–76 (2d Cir. 1984); cf. *Ross v. Marshall*, 426 F.3d 745, 757–60 (5th Cir. 2005). It may therefore have made more sense for them to have ignored the present litigation entirely, rather than trying to become a party to it, and to have relied on the Illinois courts to rule that the insurance policies do not cover liability for violating the Telephone Consumer Protection Act, or that King Supply had failed to deal in good faith with their insurers in settling the case as it did.

The insurers have won just the first round in the Illinois litigation; it remains to be determined whether their victory will withstand appellate review. But all that matters in this appeal is that in the present litigation they mishandled their response to the class action suit against their insured.

AFFIRMED.

HAMILTON, *Circuit Judge*, concurring. I join fully Judge Posner's opinion for the court affirming the denial of the insurers' motion to intervene as untimely. I write separately to note my agreement with the district court's alternative but more important holding, which Judge Posner's opinion acknowledges but does not actually resolve: the insurance companies lacked the sort of interest in the case that would justify mandatory or permissive intervention.

Even if the insurers had sought to intervene back in 2009, the district court said, intervention still would have been denied. *CE Design Ltd. v. King Supply Co.*, 2012 WL 2976909, at *13–15 (N.D. Ill. July 20, 2012). Having denied coverage for both defense and indemnification, the district court reasoned, the insurers lacked an "interest in the property or transaction that is the subject of the action" needed to intervene as of right under Rule 24(a) and lacked "a claim or defense that shares with the main action a common question of law or fact" needed for permissive intervention under Rule 24(b). I agree.

The question is important because such disputes can arise any time a liability insurer denies coverage. The world is a dangerous and litigious place. People and businesses buy liability insurance in large part for peace of mind—the knowledge that if one is sued, the insurer will provide a legal defense and will indemnify for a covered loss up to the policy limits.

When an insurer breaches its duty to defend or indemnify its insured, it's not just any breach of contract. An insurer's breach abandons its insured and deprives it of the peace of mind it has bought. Moreover, most contract law assumes that the victim of a seller's breach can "cover" for the breach

by buying a substitute product or service. That assumption does not apply to a liability insurer's breach. There is no market for insuring risks already realized. Once a claim for potential loss is known, no other insurer will step up to provide coverage at a reasonable premium. The abandoned insured is left truly on its own.[1]

The premise of these insurers' motion to intervene, whether timely or not, is that insurers who might later be found to have breached their coverage contract need to intervene to protect themselves from a settlement they might be required to pay without having participated in the deal. The insurers say they are either entitled or should be permitted to join the underlying tort suit to try to derail a settlement that their insured has reached to try to save it from the worst consequences of the insurers' breach.

The district court here correctly rejected that premise. Insurers gain an interest in an underlying tort suit—and re-

---

[1] For that reason, courts generally provide fairly light scrutiny to settlements like this one, in which the abandoned insured makes a deal with the injured plaintiffs for a modest payment from the insured with perhaps much more to come from the insurer, typically by means of a covenant not to execute or an assignment of available insurance proceeds to the plaintiffs, if coverage can be shown. See, e.g., *Home Federal Savings Bank v. Ticor Title Ins. Co.*, 695 F.3d 725, 736 (7th Cir. 2012); *Cincinnati Ins. Co. v. Young*, 852 N.E.2d 8, 14 (Ind. App. 2006); *Midwestern Indemnity Co. v. Laikin*, 119 F. Supp. 2d 831, 838–42 (S.D. Ind. 2000); *Frankenmuth Mutual Ins. Co. v. Williams*, 690 N.E.2d 675, 679 (Ind. 1997); *United Services Automobile Ass'n v. Morris*, 741 P.2d 246, 253–54 (Ariz. 1987); *Miller v. Shugart*, 316 N.W.2d 729, 733–35 (Minn. 1982); Restatement (Second) of Judgments § 57 (1982). For the Illinois standard regarding the reasonableness of such settlements, see *Guillen ex rel. Guillen v. Potomac Ins. Co. of Illinois*, 785 N.E.2d 1, 14 (Ill. 2003).

quire protection from a settlement in that case—if and only if they lose the coverage issue (typically in a separate suit) and are therefore on the hook to indemnify the insured.

I realize, of course, that it seems unlikely there was an actual breach in this case. The Illinois trial court has found the insurers had no duty to cover King Supply in this case, and the policy language seems pretty clearly in their favor. But the motion to intervene, whether timely or not, was designed to protect the insurers if and only if they ultimately lose the coverage issue. For purposes of the intervention issue, we need to assume for now that the insurers will be found to have breached.

The First Circuit rejected a similar effort by insurers denying coverage to intervene to challenge a settlement made by their insured in *Travelers Indemnity Co. v. Dingwell*, 884 F.2d 629, 638–41 (1st Cir. 1989). The court held that the insurers did not have the sort of interest in the underlying tort case that would allow them to intervene either by right or by permission to challenge the settlement. The court reasoned that when an insurer denies coverage, its interest in the underlying tort case is entirely contingent on whether the insurer was within its rights to deny coverage. A court deciding coverage might determine that the liability was not covered, so permitting intervention to argue about the validity of any settlement in the tort case would "grant the insurer a double bite at escaping liability." *Id.* at 639 (citation omitted).

The First Circuit's opinion in *Travelers* is careful, thorough, and persuasive, and we should follow it. If anything, its reasoning applies with even greater force in this case where the insurers did not agree, as they did in *Travelers*, to

pay for the tort defense. Consistent with *Travelers* on the lack of an interest to support intervention, see also *Restor-A-Dent Dental Laboratories, Inc. v. Certified Alloy Products, Inc.*, 725 F.2d 871, 874–76 (2d Cir. 1984) (affirming denial of insurer's motion for intervention as of right and by permission in underlying tort case in effort to clarify whether adverse judgment would be covered loss or not); *Cincinnati Ins. Co. v. Young*, 852 N.E.2d 8, 13–16 (Ind. App. 2006) (reversing grant of insurer's motion under analogous Indiana procedure to intervene to appeal insured's liability where coverage was contested).[2]

Adopting the reasoning found in these cases, the district court correctly found that the motion to intervene would have been denied even if it had been timely.

---

[2] The Fifth Circuit took a different approach in *Ross v. Marshall*, 426 F.3d 745, 757–60 (5th Cir. 2005), holding that an insurer that had defended a tort case under a reservation of rights was entitled to intervene in the underlying tort case to appeal after those parties had settled with an assignment of defendant's insurance coverage to plaintiffs. In that case, however, the district court had also held that the loss was covered under the insurance policy. *Id.* at 750. That holding in my view gave the insurer a direct interest in the tort case, distinguishing the case from *Dingwell* and *Restor-A-Dent.*