[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-16486; 16-16783
_____

D.C. Docket No. 0:15-cv-60716-WPD

DR. DAVID S. MURANSKY,
individually and on behalf of all others similarly situated,

Plaintiff - Appellee,

JAMES H. PRICE,
ERIC ALAN ISAACSON,

Interested Parties - Appellants,

versus

GODIVA CHOCOLATIER, INC.,
a New Jersey corporation,

Defendant - Appellee.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(April 22, 2019)

Before MARTIN, JORDAN, and GINSBURG,[*] Circuit Judges.

MARTIN, Circuit Judge:

We sua sponte vacate our previous opinion and publish this one in its place. For ease of reading, the major change is to Part II.B, our discussion of Dr. Muransky's standing to bring this action.

This appeal was brought to contest the approval of a class-action settlement. Dr. David Muransky filed a class action against Godiva Chocolatier, Inc. for violating the Fair and Accurate Credit Transactions Act ("FACTA"). Appellants James Price and Eric Isaacson ("the objectors") objected to a class settlement reached by Dr. Muransky and Godiva. Over their objections, the District Court approved the settlement, class counsel's request for attorney's fees, and an incentive award for Dr. Muransky. After careful review and with the benefit of oral argument, we affirm.

## I. Background

In April 2015, Dr. Muransky filed a class action against Godiva for allegedly violating FACTA. FACTA prohibits merchants from printing "more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of the sale or transaction." 15 U.S.C. § 1681c(g)(1). We

---

[*] Honorable Douglas H. Ginsburg, United States Circuit Judge for the District of Columbia Circuit, sitting by designation.

will refer to this as the "truncation requirement."

FACTA authorizes customers to sue merchants that willfully or negligently violate the truncation requirement. 15 U.S.C. §§ 1681n(a); 1681o(a). A merchant willfully violates FACTA by acting in knowing violation of its statutory duties or by acting in reckless disregard of those duties. See Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 57–58, 127 S. Ct. 2201, 2208–09 (2007). For willful violations, customers may recover actual damages or statutory damages from $100 to $1000, and punitive damages. 15 U.S.C. § 1681n(a)(1), (a)(2); Safeco, 551 U.S. at 53, 127 S. Ct. at 2206. Customers can recover statutory damages for willful violations even if they cannot show their identity was stolen or credit impacted, 15 U.S.C. § 1681n(a), and even if they received and kept the defective receipt. Engel v. Scully & Scully, Inc., 279 F.R.D. 117, 125–26 (S.D.N.Y. 2011). By contrast, when the violation is a result of negligence, customers can only recover their actual damages as well as attorney's fees. 15 U.S.C. § 1681o(a); Engel, 279 F.R.D. at 125–26.

The operative complaint alleges that after Dr. Muransky made a purchase at a Godiva store, Godiva gave him a receipt that showed his credit card number's first six and last four digits. Dr. Muransky sought to represent a class of customers whose credit card numbers Godiva printed on receipts in violation of FACTA. These violations, the complaint says, exposed Dr. Muransky and the class "to an

elevated risk of identity theft."  According to the complaint, Godiva's violation of FACTA was willful, so the class was entitled to statutory and punitive damages, as well as attorney's fees and costs.  See id. § 1681n(a).

Godiva moved to dismiss the complaint on the ground that it did not plausibly allege a willful violation of FACTA.  The District Court denied Godiva's motion.  After that, the parties engaged in discovery then mediated the case.  In late November 2015, the parties notified the court of an agreement in principle to settle the case on a class-wide basis.  They requested a stay, which the court granted.

Two months after that request, Dr. Muransky moved for preliminary approval of the class-action settlement.  He explained that the parties agreed to a settlement fund of $6.3 million from which all fees, costs, and class members would be paid.  He estimated that class members who submitted a timely claim form would receive around $235 as their pro-rata share of the settlement fund.  None of the money would revert to Godiva.  Dr. Muransky indicated he intended to apply for an incentive award of up to $10,000 and that class counsel would move for an award of attorney's fees of up to one-third of the settlement fund, which would be $2.1 million.

In this motion, Dr. Muransky also argued that the amount class members would recover by submitting a claim compared favorably to their possible recovery

4

had the case proceeded to trial.  FACTA provides for a combination of actual and statutory damages.  15 U.S.C. § 1681n(a).  For statutory damages, FACTA provides for an award of $100 to $1,000 for each violation.  Id. § 1681n(a)(1)(A).  Given the nature of the violation, Dr. Muransky acknowledged there was "a good chance" each class member would recover the $100 minimum statutory damage award if the case went to trial.  At the fairness hearing, the District Court agreed with Dr. Muransky's assessment, saying it was reasonable for class counsel to have estimated that class members "could [receive] more than double what the class members could get if they went to trial and won the case."

Dr. Muransky's motion also addressed some of the risks that favored pre-trial settlement.  Most notably, Dr. Muransky pointed to two cases then pending before the Supreme Court: Spokeo, Inc. v. Robins, 578 U.S. ___, 136 S. Ct. 1540 (2016), on Article III standing, and Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. ___, 136 S. Ct. 1036 (2016), on class certification under Federal Rule of Civil Procedure 23(b)(3).  The outcomes of those two cases, which at the time were uncertain, posed serious risks to the class members' ability to pursue FACTA claims against Godiva.  Dr. Muransky also acknowledged the difficulty of proving the "willfulness" of Godiva's FACTA violation, which the District Court also discussed at the fairness hearing.  Without proving "willfulness," the class would not be entitled to statutory damages.  See 15 U.S.C. § 1681n(a).

5

The motion for preliminary approval also contained a proposed class notice and a proposed schedule of notice, opt-out, and motion deadlines.  The proposed notice said Dr. Muransky would seek an incentive award of up to $10,000 "for his work in representing the class" and that class counsel would seek up to $2.1 million in attorney's fees.  The District Court granted the motion for preliminary approval, certified the class under Rule 23(b)(3), and approved the form of notice.  Under the preliminary approval order, class members who wanted to be excluded from the settlement were required to give written notice of exclusion to the claims administrator.  Those who failed to submit an opt-out certification would be included in the settlement class and bound by its terms.  Then to get money from the settlement fund, class members had to file a claim form with the claims administrator.  Class members could also file objections, which the court would consider as part of its determination of whether the settlement was fair.  After extensions by the District Court, the final deadline for class members to submit claims, object, or opt-out was August 23, and the deadline for Dr. Muransky to move for final settlement approval was September 9.

Notice of the settlement was sent to 318,000 class members and over 47,000 submitted claim forms.  Only fifteen class members opted out.  Five class members, including Mr. Price and Mr. Isaacson, objected to the settlement.  In their objections, Mr. Price and Mr. Isaacson said they are members of the

6

settlement class and that they timely submitted claim forms. Among other arguments, they said notice of Dr. Muransky's attorney's fee motion was inadequate under Rule 23(h); the court should subject any attorney's fee award to a lodestar analysis; and a $10,000 incentive award was not warranted.

On September 7, Dr. Muransky moved for final approval of the class settlement and requested an award of $2.1 million in attorney's fees as well as $10,000 as an incentive award. At the court's direction, Dr. Muransky filed a separate motion for attorney's fees and expenses. The Magistrate Judge issued a report and recommendation ("R&R") on the attorney's fee motion just four days later, before the objectors filed opposition briefs. The R&R recommended that the District Court grant the motion and award the full amount of $2.1 million. Although the R&R was issued before the objectors filed opposition briefs, the Magistrate Judge considered Mr. Price's and Mr. Isaacson's previously filed objections to the settlement. In addition, soon after the R&R was issued, the objectors filed briefs in opposition to the motion for attorney's fees. They later filed objections to the R&R as well.

On September 21, the District Court held a fairness hearing, during which objectors' counsel made their case. During the hearing, Mr. Isaacson's counsel raised standing as a new objection, saying that the court needed to decide whether Dr. Muransky had Article III standing. Soon after the hearing, the District Court

7

approved the settlement and gave the incentive award and attorney's fees to Dr. Muransky and class counsel respectively.  In response to the objectors' argument that notice was not adequate, the District Court noted it had "permitted objections to be filed both before and after" the motion for attorney's fees was filed and that "meaningful objections were in fact filed both before and after the filing" of that motion.  The court said it had reviewed the class members' objections to the R&R de novo, "taken them into full consideration," and "carefully analyzed" them.  The court then found that the requested attorney's fees were reasonable and awarded $2.1 million, one-third of the settlement fund, in fees.  The Court also granted the $10,000 incentive award for Dr. Muransky's "efforts in this case."

The objectors appealed.  They say the District Court abused its discretion by finding that the notice satisfied Rule 23(h), by awarding $2.1 million in attorney's fees, and by awarding $10,000 as an incentive to Dr. Muransky.   Mr. Isaacson raises a fourth issue: he challenges Dr. Muransky's Article III standing to pursue a FACTA claim against Godiva.  Before addressing those arguments, we consider the objectors' ability to make them on appeal.  We then consider the merits of the arguments properly before us.

8

## II. Jurisdiction

### A. The objector's right to appeal

The Supreme Court has held "only parties to a lawsuit, or those that properly become parties, may appeal an adverse judgment." Marino v. Ortiz, 484 U.S. 301, 304, 108 S. Ct. 586, 587 (1988) (per curiam). We start by deciding whether objectors like Mr. Price and Mr. Isaacson are "parties" with the ability to appeal from a district court's judgment. We hold that they are.

In Devlin v. Scardelletti, 536 U.S. 1, 122 S. Ct. 2005 (2002), the Supreme Court addressed whether a nonnamed class member who timely objects to a settlement agreement but does not opt out is a "party for the purposes of appealing the approval of the settlement." Id. at 7, 122 S. Ct. at 2009 (quotation marks omitted). The Court held that nonnamed class members who are bound by a judgment must "be allowed to appeal the approval of a settlement when they have objected at the fairness hearing." Id. at 10, 122 S. Ct. at 2011. "To hold otherwise," the Court explained, "would deprive nonnamed class members of the power to preserve their own interests in a settlement that will ultimately bind them, despite their expressed objections before the trial court." Id.

Devlin addressed a mandatory settlement class, but not whether objectors to a Rule 23(b)(3) settlement who can opt out of a settlement also are "parties" that can appeal. See id. at 10–11, 122 S. Ct. at 2011 (noting that appeal was the

9

objectors' only option because they could not opt out of the settlement).  Since Devlin, the only circuit courts of appeal to have decided this issue have held that class members who object to a Rule 23(b)(3) settlement but do not opt out are "parties" for purposes of appeal.[1]  Generally, these courts reason that Devlin "is about party status and one who could cease to be a party is still a party until opting out."  Nat'l Ass'n of Chain Drug Stores, 582 F.3d at 40.  In AAL High Yield Bond Fund v. Deloitte & Touche LLP, 361 F.3d 1305 (11th Cir. 2004), this Court ruled that objectors who were not class members could not appeal because they were not "parties who are actually bound by a judgment."  Id. at 1310.  Yet at the same time, we know that actual class members who object but do not opt out of a Rule 23(b)(3) class settlement are still bound by the judgment approving the class settlement.  See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614–15, 117 S. Ct. 2231, 2245 (1997).  With all of this in mind, we conclude that class members who object to Rule 23(b)(3) class settlements but do not opt out are "parties" for purposes of appeal.  Mr. Price and Mr. Isaacson are therefore proper parties.

## B.  Article III standing

We next consider whether Dr. Muransky has standing to bring this class

---

[1] Nat'l Ass'n of Chain Drug Stores v. New England Carpenters Health Benefits Fund, 582 F.3d 30, 39–40 (1st Cir. 2009); Fidel v. Farley, 534 F.3d 508, 512–13 (6th Cir. 2008); Churchill Vill., LLC v. Gen. Elec., 361 F.3d 566, 572–73 (9th Cir. 2004); In re Integra Realty Res., Inc., 354 F.3d 1246, 1257–58 (10th Cir. 2004).

10

action.  Standing is a limitation on federal subject matter jurisdiction derived from Article III.  Spokeo, Inc. v. Robins, 578 U.S. __, 136 S. Ct. 1540, 1546–47.  It requires plaintiffs to show they suffered an injury in fact traceable to the defendant's conduct and redressable by a favorable judicial decision.  Id. at 1547.

As the party invoking jurisdiction, of course it is the plaintiff who bears the burden of establishing standing.  Id.  However, a plaintiff is not required to demonstrate the merits of his case in order to establish his standing to sue.  Pedro v Equifax, Inc., 868 F.3d 1275, 1279 (11th Cir. 2017).  Beyond that, we are here evaluating standing at the motion to dismiss stage, so we are also mindful that the plaintiff's burden for establishing standing corresponds to "the manner and degree of evidence required at the successive stages of litigation."  Bischoff v. Osceola Cty., 222 F.3d 874, 878 (11th Cir. 2000) (quoting Lujan v. Defs. of Wildlife, 405 U.S. 555, 561, 112 S. Ct. 2130, 2136 (1992)).  Thus, "when standing becomes an issue on a motion to dismiss, general factual allegations of injury resulting from the defendant's conduct may be sufficient to show standing."  Moody v. Holman, 887 F.3d 1281, 1286 (11th Cir. 2018) (quotation marks omitted).  So in order to survive a facial challenge on a motion to dismiss, a plaintiff is required to allege enough facts to show he plausibly has standing.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007).  After de novo review, London v. Wal-Mart Stores, Inc., 340 F.3d 1246, 1251 (11th Cir. 2003), we conclude Dr.

11

Muransky alleged enough to carry his burden of showing standing at this stage.

Dr. Muransky alleges he suffered a heightened risk of identity theft when Godiva printed more digits of his credit card number than the law allows. Because the objectors raise a facial challenge to standing, we must accept the truth of this allegation. See Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc., 524 F.3d 1229, 1232–33 (11th Cir. 2008) (per curiam). Dr. Muransky has plainly shown Godiva's conduct caused the alleged injury, and the statutory damages Dr. Muransky seeks will redress it. He has thus shown two of the three elements of standing: causation and redressability.

We turn, then, to our reasons for concluding the heightened risk of identity theft Dr. Muransky experienced as a result of the FACTA violation constitutes an injury in fact. "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, 136 S. Ct. at 1548 (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 2136 (1992)). Dr. Muransky's alleged injury is "particularized" because the heightened risk of identity theft affected him "in a personal and individual way"—it was his credit card number that appeared on the receipt. Spokeo, 136 S. Ct. at 1548 (quoting Lujan, 504 U.S. at 560 n.1, 112 S. Ct. at 2136 n.1). The injury is "actual" rather than "conjectural" because it has already occurred. See Robins v.

Spokeo, Inc. (Spokeo II), 867 F.3d 1108, 1117–18 (9th Cir. 2017); cf. Clapper v.

Amnesty Int'l USA, 568 U.S. 398, 409, 133 S. Ct. 1138, 1147 (2013) (explaining

that possible future injury does not constitute an injury in fact).  Dr. Muransky

suffered the heightened risk of identity theft the moment Godiva printed too many

digits of his credit card number.

That brings us to whether the heightened risk of identity theft is sufficiently

"concrete" to confer standing.  Our starting point in this analysis is the Supreme

Court's decision in Spokeo.  We first review Spokeo and then turn to our analysis

of Dr. Muransky's standing.

### i.    Interpreting Spokeo

Spokeo clarified that concreteness and particularity are distinct, and both are

essential to establish injury in fact.  136 S. Ct. at 1548.  But Spokeo did not, as the

objector suggests, alter either the concreteness or particularity analysis.  That is,

Spokeo did not change the legal principles that have long governed both.  See In re

Horizon Healthcare Servs. Inc. Data Breach Litig., 846 F.3d 625, 638 (3d Cir.

2017) ("[W]e understand that the Spokeo Court meant to reiterate traditional

notions of standing."); Lee v. Verizon Commc'ns, Inc., 837 F.3d 523, 529 (5th Cir.

2016) ("The Supreme Court reaffirmed in Spokeo that violation of a procedural

right granted by statute may in some circumstance be a sufficiently concrete, albeit

intangible, harm to constitute injury-in-fact without an allegation of 'any additional

13

harm beyond the one Congress has identified.'" (quoting Spokeo, 136 S. Ct. at 1549) (first emphasis added)).

Spokeo reaffirmed a "'concrete' injury must be 'de facto'; that is, it must actually exist." 136 S. Ct. at 1548; see also id. at 1555–56 (Ginsburg, J., dissenting) ("Concreteness as a discrete requirement for standing, the Court's decisions indicate, refers to the reality of an injury, harm that is real, not abstract, but not necessarily tangible."). But "concrete" is not "necessarily synonymous with 'tangible.'" Id. at 1549 (majority opinion). After Spokeo as before, "intangible" injuries, including injury in the form of a "risk of real harm," may satisfy Article III's concreteness requirement. Id. Nor must the injury (tangible or not) be substantial. Spokeo made no change to the rule that "a small injury, 'an identifiable trifle,' is sufficient to confer standing." Common Cause/Georgia v. Billups, 554 F.3d 1340, 1351 (11th Cir. 2009) (quoting United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 689 n.14, 93 S. Ct. 2405, 2417 n.14 (1973)).

The objector argues that Spokeo compels the conclusion that Dr. Muransky's injury was not concrete. However, he neglects to mention that the Spokeo Court did not decide whether the plaintiff in that case suffered a concrete injury. Spokeo, 136 S. Ct. at 1545, 1550. Instead, the Court pointed out that the Ninth Circuit erred in conflating concreteness and particularity, and then vacated

14

and remanded the case for the Ninth Circuit to rule on concreteness in the first instance.  Id. at 1550 ("We take no position as to whether the Ninth Circuit's ultimate conclusion—that Robins adequately alleged an injury in fact—was correct.").

In remanding Spokeo, the Supreme Court noted that, as has long been the case, "both history and the judgment of Congress play important roles" in analyzing concreteness.[2]  Id. at 1549.  History plays a role because the Article III case-or-controversy requirement, from which standing is derived, "is grounded in historical practice."  Id.  For that reason, "it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts."  Id.  Congress' judgment plays a role because it "is well positioned to identify intangible harms that meet minimum Article III requirements."  Id.  And while Spokeo reiterated that "bare procedural violation[s], divorced from any concrete harm" do not give rise to standing, it made clear that "the violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury

---

[2] Neither point was an innovation.  The Supreme Court looked to "the long tradition of qui tam actions in England and the American Colonies" in concluding a plaintiff had standing to sue under the False Claims Act.  Vermont Agency of Nat. Res. v. United States ex rel. Stevens, 529 U.S. 765, 774–78, 120 S. Ct. 1858, 1863–65 (2000).  And the Court has many times held that Congress "may 'elevate to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law.'"  Spokeo, 136 S. Ct. at 1549 (alteration adopted) (quoting Lujan, 504 U.S. at 578, 112 S. Ct. at 2145).

in fact." Id.; see also Frank v. Gaos, 586 U.S. __, 139 S. Ct. 1041, 1046 (2019) (per curiam) (remanding for reconsideration in light of Spokeo). On remand, the Ninth Circuit concluded the plaintiff had shown a concrete injury. Spokeo II, 867 F.3d at 1118.

As we see it, Spokeo's upshot in cases like this one is that a plaintiff may show injury in fact by alleging "the violation of a procedural right granted by statute" poses a "risk of real harm" to a concrete interest. Spokeo 136 S. Ct. at 1549; see Strubel v. Comenity Bank, 842 F.3d 181, 190 (2d Cir. 2016) ("[W]e understand Spokeo, and the cases cited therein, to instruct that an alleged procedural violation can by itself manifest concrete injury where Congress conferred the procedural right to protect a plaintiff's concrete interests and where the procedural violation presents a risk of real harm to that concrete interest." (quotation marks omitted)); see also Spokeo II, 867 F.3d at 1113 ("[W]e now agree that the Second Circuit's formation in Strubel best elucidates the concreteness standards articulated by the Supreme Court in Spokeo."). The common law and congressional judgment inform the necessary quantum of risk. Spokeo, 136 S. Ct. at 1549–50. And where Congress elevates the risk of harm to a concrete interest to the status of a concrete injury, the risk need be no more than an "identifiable trifle" to be concrete. See Billups, 554 F.3d at 1351.

Borrowing a hypothetical the Supreme Court offered in Spokeo may

16

illuminate our reading of that case.  There, the Court acknowledged that Congress enacted the Fair Credit Reporting Act (FCRA) to "curb the dissemination of false information" but noted that "not all inaccuracies cause harm or present a material risk of harm."  Spokeo, 136 S. Ct. at 1550.  For example, the Court said it would be "difficult to imagine how the dissemination of an incorrect zip code, without more, could work any concrete harm."  Id.  At the same time, the Supreme Court did not foreclose the possibility that an incorrect zip code could in some instances pose a risk of harm to a concrete interest.  An employer might, for example, be looking for a worker with connections to and knowledge of a particular city.  But if a third party posted an incorrect zip code for the person online, that might put the person's employment prospects at risk or even kill a job opportunity.  A plaintiff who alleged a risk that this might come to pass would show a connection between the violation of a statutory right and a concrete interest in employment.  See Spokeo II, 867 F.3d at 1115–17.  This, we think, is the "more" the Supreme Court said Article III demands when a plaintiff alleges a statutory violation that would otherwise be unmoored from any concrete harm.

### ii.    Applying Spokeo

Application of these principles here demonstrates that Dr. Muransky's injury is concrete for two independent reasons.  First, Congress judged the risk of identity theft Dr. Muransky suffered to be sufficiently concrete to confer standing.  Second,

17

the risk of identity theft bears a close enough relationship to the common law tort of breach of confidence to make Dr. Muransky's injury concrete. Either is enough on its own to establish standing. We address each in turn.

With FACTA, Congress sought to "protect[] consumers from identity theft." Harris v. Mexican Specialty Foods, Inc., 564 F.3d 1301, 1306 (11th Cir. 2009); see also Credit and Debit Card Receipt Clarification Act of 2007 ("Clarification Act"), Pub. L. No. 110-241, § 2(a)(1), 122 Stat. 1565, 1565 (finding that "the purpose[]" of FACTA is to "reduce identity theft and credit card fraud").[3] The truncation requirement reflects Congress's view that printing more than the last five digits of a credit card number contributes to the problem of identity theft. See Harris, 564 F.3d at 1306.

The legislative history confirms as much. After FACTA passed, businesses faced crippling litigation because they continued printing expiration dates on receipts, which FACTA prohibits. Clarification Act § 2(a)(4). With the Clarification Act, Congress gave amnesty to merchants that printed an expiration date on a receipt between FACTA's passage and the passage of the Clarification Act. Id. § 3(a). But Congress granted no amnesty to merchants who printed more

---

[3] Conference and committee reports on FACTA likewise indicate that its purpose was to combat identity theft. H.R. Rep. No. 108-396, at 1753–54 (2003) (Conf. Rep.); H.R. Rep. No. 108-263, at 22 (2003) (noting that FACTA's truncation requirement was enacted in part to combat identity theft).

18

than the permitted number of digits.  Id.  Quite to the contrary, it found that

"[e]xperts in the field agree that proper truncation of the card number, by itself as

required by [FACTA] . . . , prevents a potential fraudster from perpetrating identity

theft or credit card fraud."  Id. § 2(a)(6).[4]

Dr. Muransky alleged that Godiva's FACTA violation subjected him to a

risk of real harm to the concrete interest in avoiding identity theft, the very interest

that Congress sought to protect with FACTA.  We think it beyond debate that a

consumer has a concrete interest in preventing his identity from actually being

stolen.  See Attias v. Carefirst, Inc., 865 F.3d 620, 627 (D.C. Cir. 2017) ("Nobody

doubts that identity theft, should it befall one of these plaintiffs, would constitute a

concrete and particularized injury.").  Victims of identity theft face a host of

financial woes.  To name just one, identity thieves can run up fraudulent credit

card charges and leave the victim with the bill, and all the problems associated

with getting the fraudulent charges cleaned up.  Dr. Muransky's allegation, which

we accept as true, thus establishes a risk of real harm to a concrete interest.

With FACTA's truncation requirement, Congress "adopt[ed a] procedure[]

designed to decrease that risk" that a consumer would have his identity stolen.

---

[4] Legislative materials show that members who supported the bill favored amnesty for businesses that printed expiration dates but not those that violated the truncation requirement, on the view that "truncation of the credit card numbers accomplishes the intent of the statute."  154 Cong. Rec. E925-02, 2008 WL 2051340 (2008) (statement of Rep. Maloney); see generally 154 Cong. Rec. H00000-29, 2008 WL 2038627 (2008).

Spokeo, 136 S. Ct. at 1550.  Congress's elevation of the risk to the status of a concrete harm is a judgment we accept under the principles laid down in Spokeo. The risk may not be great, but a great risk is not necessary to satisfy Article III's minimal demand for an "identifiable trifle."  Billups, 554 F.3d at 1351 (quotation marks omitted).  In our view, if Congress adopts procedures designed to minimize the risk of harm to a concrete interest, then a violation of that procedure that causes even a marginal increase in the risk of harm to the interest is sufficient to constitute a concrete injury.  And that is what Congress did here.

Indeed, this is a case in point for Congress's relatively greater institutional competence to draw the line between a concrete injury and non-actionable risk. Spokeo, 136 S. Ct. at 1549 ("Congress is well positioned to identify intangible harms that meet minimum Article III requirements, [making] its judgment . . . instructive and important."); see also Daniel Townsend, Who Should Define Injuries for Article III Standing?, 68 Stan. L. Rev. Online 76, 81–83 (2015) (discussing Congress's superior ability to gather facts and make empirical judgments about the risk underlying injuries).  After hearing from experts on the matter, Congress decided to set the tolerable level of risk at printing the last five digits of a card number.  We decline to substitute our judgment for Congress's by saying that, as a matter of law, the risk of identity theft is not concrete until a merchant prints the first eight or ten digits instead of the first six.

In sum, Congress conferred the procedural right in FACTA to reduce the risk of identity theft.  Dr. Muransky alleged he suffered a heightened risk of identity theft as a result of a FACTA violation.  That allegation suffices for standing under Spokeo.

We are aware the Third Circuit recently drew the opposite inference from the Clarification Act.  That court ruled that, in passing the Clarification Act, Congress intended to limit FACTA actions to "those claims implicating actual harm."  By this, the court seemed to say that the statute aided only those plaintiffs who claimed their identities were in fact stolen.  Kamal v. J. Crew Grp., Inc., 918 F.3d 102, 113 (3d Cir. 2019).  Our understanding of the Clarification Act does not comport with this ruling in Kamal.  In our view, when it left the truncation requirement in place at the same time it limited liability for printing expiration dates, Congress judged the truncation requirement necessary to prevent the risk of identity theft.  In fact, Congress made a specific finding that FACTA's truncation requirement by itself would "prevent[] a potential fraudster from perpetrating identity theft or credit card fraud."  Clarification Act § 2(a)(6).  We are also mindful that Spokeo expressly recognized that the risk of harm may satisfy the concreteness requirement, even absent a tangible injury.  As we have explained, FACTA creates a procedure to minimize the risk of identity theft.  For these reasons we decline to follow the Third Circuit's rule that actual identity theft is

21

required for standing to bring a FACTA claim.

Our holding here is not inconsistent with other decisions from our sister circuits that found no standing in FACTA cases. The Second, Seventh, and Ninth Circuits have all found no standing in cases where consumers alleged a merchant printed receipts that included a credit card expiration date in violation of FACTA. Bassett v. ABM Parking Servs., Inc., 883 F.3d 776 (9th Cir. 2018); Crupar-Weinmann v. Paris Baguette Am., Inc., 861 F.3d 76 (2d Cir. 2017); Meyers v. Nicolet Rest. of De Pere, LLC, 843 F.3d 724 (7th Cir. 2016). We think those cases are distinguishable from this one. They all rely on Congress's finding in the Clarification Act that "a receipt with a credit card expiration date does not raise a material risk of identity theft." Crupar-Weinmann, 861 F.3d at 78; see also Bassett, 883 F.3d at 781–82; Meyers, 843 F.3d at 727–28. As we explained, the Clarification Act points to the opposite conclusion in this case.[5]

The Second Circuit also found no standing in a FACTA case that is distinguishable in its posture. In Katz v. Donna Karan Co., L.L.C., 872 F.3d 114 (2d Cir. 2017), the Second Circuit dismissed a FACTA case where the district court found on a factual challenge to standing that printing the first six digits of a credit card number poses no risk of identity theft. Id. at 116. Specifically, the

---

[5] To be clear, we express no view whether a plaintiff suffers a concrete injury when a merchant prints an expiration date on a receipt in violation of FACTA.

district court found that the first six digits of a credit card number identify only the card issuer, which, in turn, poses no risk of identity theft. Id. at 118–19. The district court also found that the receipts at issue in Katz did not "disclose[] Katz's name, a fact that also reduces the possibility that disclosure of the [first six digits] would result in harm." Id. at 120. Reviewing these findings for clear error, the Second Circuit affirmed. However it did express trepidation about the "abbreviated" fact-finding procedure the district court appeared to have used. Id.

We are wary of Katz's premise that a federal district court may make factual findings that override Congress's standard for what harm constitutes a concrete injury. Congress engaged in its own factfinding and set a uniform standard for the number of digits appropriate to print in its effort to curb the risk of identity theft. Clarification Act § 2(a)(6). We do not read Spokeo as giving courts a license to reject the standard set by Congress in favor of judge-found facts at odds with that standard. Spokeo certainly makes clear that not all statutory violations constitute an injury in fact. Spokeo, 136 S. Ct. at 1549; see also Frank, 139 S. Ct. at 1046. However, we have explained that a plaintiff can establish Article III standing at the pleading stage by alleging a risk of harm of the type Congress elevated to the status of a concrete injury when it created procedures designed to minimize that risk. See Spokeo, 136 S. Ct. at 1549. Once a plaintiff does that, Article III's concreteness requirement is satisfied. See id. Here, Congress established the acceptable level of

23

risk at printing five digits of a credit card number.  Dr. Muransky alleged a heightened risk of identity theft as a result of Godiva's FACTA violation, and that satisfies Article III under the principles Spokeo laid down.

In any event, Katz is distinguishable from this case.  There is nothing in the record before us to support a finding that the first six digits identify a card issuer or that printing the first six digits poses no risk of identity theft.  We will not impose a factual finding made in the Southern District of New York upon Mr. Muransky, particularly given the Second Circuit's concern about the fact-finding procedures in that case.  See McIvor v. Credit Control Servs., Inc., 773 F.3d 909, 914 (8th Cir. 2014) ("Judicial notice of another court's opinion takes notice of the existence of the opinion, which is not subject to reasonable dispute over its authenticity, but not of the facts summarized in the opinion." (quotation marks omitted).  Here, we don't even have "abbreviated" factfinding.  We have no factfinding at all.  Dr. Muransky has had no chance to rebut the objectors' claims about the risk the first six digits pose.  At minimum, then, we decline to follow Katz based on its procedural posture.  Rather, as we must on this facial challenge to a motion to dismiss, we accept as true that Dr. Muransky suffered a heightened risk of identity theft.

Finally, we examine the Ninth Circuit ruling that a plaintiff had no standing to bring a FACTA action where a merchant printed the first digit of his credit card

24

number along with the last four.  Noble v. Nev. Checker Cab Corp., 726 F. App'x 582, 583–84 (9th Cir. 2018) (per curiam) (unpublished).  This unpublished opinion does not say whether the court was considering a facial or factual challenge.  We therefore cannot know how the court came to hold that this posed no risk of harm.

Also, we know that the Ninth Circuit had binding precedent holding that a FACTA plaintiff lacked standing where the plaintiff "did not allege that anyone else had received or would receive a copy of" the noncompliant receipt.  Id. at 584 (citing Bassett, 883 F.3d at 776).  This Circuit has no such precedent, and we decline to adopt the Ninth Circuit's reasoning.  FACTA is designed to minimize the risk that disclosure will occur, not to remedy only actual disclosures.  We accept that a risk of disclosure is greater if someone else sees the receipt.  But Congress made it unlawful to print more than the last five digits of a credit card number, not to print more than the last five digits and show the receipt to someone. From this, we deduce that Congress intended to draw the line at the risk that comes of printing the untruncated card number, irrespective of whether anyone saw the receipt.  And we decline to follow opinions from our sister circuits' opinions that rely on a contrary interpretation of the law.

Dr. Muransky can thus show standing based on Congress's judgment that the heightened risk of identity theft he experienced constitutes a concrete injury. And there is another way, as well.  His standing also independently rests on the

25

similarity between the harm he alleges and the common law tort of breach of confidence. See Spokeo, 136 S. Ct. at 1549 (describing it as "instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts" (emphasis added)).

A common law breach of confidence lies where a person offers private information to a third party in confidence and the third party reveals that information. See Alan B. Vickery, Breach of Confidence: An Emerging Tort, 82 Colum. L. Rev. 1426, 1427–28 (1982). We note that the harm from a breach of confidence occurs when the plaintiff's trust in the breaching party is violated, whether or not the breach has other consequences. See generally Alicia Solow-Niederman, Beyond the Privacy Torts: Reinvigorating A Common Law Approach for Data Breaches, 127 Yale L.J. Forum 614, 619–24 (2018) (arguing that the harm in breach of confidence results from the failure to securely maintain confidential information separate and apart from any harm resulting from publication or misuse). With FACTA, Congress created a statutory right to protect consumers' expectation that their credit card information will remain private. By printing more than the statute allows, Godiva created a heightened risk that information Dr. Muransky entrusted to it will become public. We think this risk has a sufficiently close relationship to breach of confidence to satisfy Spokeo.

We recognize the match is not exact. However, it need not be exact in order to satisfy Spokeo. A "close relationship does not require that the newly proscribed conduct would give rise to a cause of action under common law." See Susinno v. Work Out World Inc., 862 F.3d 346, 351 (3d Cir. 2017) (quotation marks omitted). A FACTA violation does not involve the kind of traditional confidential relationship that is at issue in a breach of confidence—say, a doctor-patient relationship. And unlike a common law breach of confidence, a merchant need not disclose a credit card number to anyone in order to violate FACTA. Even so, the harm in a breach of confidence tort—disclosing information provided in confidence—bears sufficient similarity to the harm Congress intended to prevent with FACTA—the risk of identity theft. A consumer provides a merchant with his credit card number with the expectation that it will remain secret, not least because of the risk of credit card fraud if the merchant reveals it. FACTA gives legal protection to that confidentiality interest by permitting merchants to print only the last five digits of a credit card number. A merchant who prints more than the permitted five digits creates a risk that information FACTA makes confidential will fall into a third party's hands. In fact, the risk here comes from the receipt Godiva gave Dr. Muransky and the copy Godiva seems to have kept. Here we are obligated to accept the allegation of the complaint that Godiva has experienced data breaches. Under these circumstances, we think the risk of disclosure bears a

27

close enough relationship to the disclosure of confidential information actionable at common law to satisfy Article III.

The Third Circuit rejected our holding in the original opinion issued in this case that breach of confidence is sufficiently analogous to give rise to standing. Kamal, 918 F.3d at 114.  In the view of the Third Circuit, the relationship between FACTA and the common law cause of action is not sufficiently analogous because the statute does not require actual disclosure while the common law tort does.  Id. We do not think Spokeo's "close relationship" standard demands such complete correlation.  Spokeo merely recognized that federal courts may have jurisdiction when Congress takes steps to prevent "the risk of real harm" that was actionable at common law.  Spokeo, 136 S. Ct. at 1549.  We read Spokeo to mean that, where the common law allowed a cause of action to remedy an injury, Congress can create a statutory cause of action to remedy the risk of such an injury.  If, for example, Congress passed a statute to minimize the risk of trespass, we see nothing in Spokeo that would mean federal courts lack jurisdiction to hear cases brought under the statute.  Here, in enacting FACTA, Congress sought to mitigate the risk of disclosure of credit card information, which we think sufficiently analogous to the disclosure of confidential information that the common law remedied by the breach of confidence tort.

The relationship we find here is consistent with the way this Circuit's post-

28

Spokeo precedent compares alleged harms to common law harms. In Nicklaw v.

CitiMortgage, Inc., 839 F.3d 998 (11th Cir. 2016), a plaintiff sued for "failure to

record a satisfaction of mortgage within a statutory period" but did not "bring suit

until after that statutory violation ha[d] been remedied;" that is, the mortgage had

been recorded by the time the plaintiff sued. Id. at 1000. The panel concluded the

statute in question "provided a remedy to prevent the risk of harm that occurred

while title to property was wrongfully clouded, not a remedy after the cloud was

lifted." Id. at 1003 (first emphasis added). It ruled the plaintiff lacked standing on

that basis. This case is distinguishable from Nicklaw. In Nicklaw, the risk had

abated by the time the plaintiff brought suit. The plaintiff's title was no longer

clouded. If a Godiva cashier immediately shredded a FACTA-noncompliant

receipt, we might agree Nicklaw controls. But nothing in this record establishes

that the receipt no longer exists. This means the risk of disclosure still exists. As

noted, the complaint indicates that Godiva might keep a version of the untruncated

receipt. And even if Dr. Muransky destroyed the receipt himself, in Nicklaw the

defendant, not the plaintiff, remedied the risk of harm. The effort Dr. Muransky

put into doing away with the risky receipt would suffice for standing. Cf. Pedro v.

Equifax, Inc., 868 F.3d 1275, 1280 (11th Cir. 2017) (holding that lost time spent

attempting to resolve credit inaccuracies suffices for standing).

To be sure, the harms alleged in Pedro and Perry v. Cable News Network,

29

Inc., 854 F.3d 1336 (11th Cir. 2017), have a closer relationship to more familiar torts than the harm alleged in this case does to breach of confidence.  In Pedro, the panel ruled that the alleged FCRA violation—"the reporting of inaccurate information about Pedro's credit to a credit monitoring service—has a close relationship to the harm caused by the publication of defamatory information." 868 F.3d at 1279–80.  In Perry, the panel ruled that an alleged violation of the Video Privacy Protection Act, which prohibits "video tape service provider[s]" from disclosing personal information about consumers, has a close relationship to "the right of privacy" and "intrusion upon seclusion."  854 F.3d at 1340–41 (quotation marks omitted).  But these cases do not foreclose our analysis.  Neither Pedro nor Perry commented on whether a plaintiff has standing where a defendant's behavior creates a heightened risk of a harm recognized at common law.

For these reasons, we conclude Dr. Muransky suffered a concrete injury, and thus that he has standing to bring this action.

### III. The Merits

**A. Notice of class counsel's attorney's fee motion**

We now consider the objectors' challenge to the sufficiency of notice of the attorney's fee motion.  As required by Rule 23(c)(2)(B), these class members got

notice of the preliminary approval of the class settlement. That notice gave

information about the attorney's fees and expenses Dr. Muransky would seek:

> Plaintiff will petition for a service award not to exceed $10,000 for his work in representing the Class, and for Class Counsel's fees not to exceed one-third of the fund, which is $2,100,000, plus reasonable expenses.

Class members got this notice in advance of counsel's motion for attorney's fees.

Yet the attorney's fees motion was not filed until two weeks after the deadline for

class members to object had already passed.[6] The class did not receive additional

notice after the motion was filed. The objectors say this process deprived class

members of the notice they needed to assess the fee request and violated Rule

23(h).

Rule 23(h) sets up the procedures required for an award of attorney's fees in

class actions. As for notice, Rule 23(h)(1) says that "[n]otice of the motion [for

attorney's fees] must be served on all parties and, for motions by class counsel,

directed to class members in a reasonable manner." Fed. R. Civ. P. 23(h)(1).

Although "reasonable manner" is not specific about when notice must be given,

courts interpreting Rule 23(h) have observed that the right to object to the fee

motion under Rule 23(h)(2) necessarily means that courts must give notice of the

attorney's fee motion itself. The leading case is In re Mercury Interactive Corp.

---

[6] Dr. Muransky originally made the attorney's fee request on September 7 as part of the motion for final approval. The District Court instructed him to file a separate attorney's fee motion, which he did on September 12.

Securities Litig., 618 F.3d 988, 989 (9th Cir. 2010).  The Ninth Circuit interpreted "[t]he plain text of" Rule 23(h) to "require[] that any class member be allowed an opportunity to object to the fee 'motion' itself, not merely to the preliminary notice that such a motion will be filed."  Id. at 993–94 (quoting Fed. R. Civ. P. 23(h)(2)).  The Advisory Committee's notes support the Ninth Circuit's interpretation of Rule 23(h).  They say that "[i]n setting the date objections are due, the court should provide sufficient time after the full fee motion is on file to enable potential objectors to examine the motion."  Fed. R. Civ. P. 23 advisory committee's note to 2003 amendment.  The Seventh Circuit follows the Ninth Circuit's Mercury decision.  Redman v. RadioShack Corp., 768 F.3d 622, 637–38 (7th Cir. 2014); see also 3 Newberg on Class Actions § 8:24 (5th ed.) (endorsing the approach of the Ninth and Seventh Circuits on doctrinal and policy grounds).

The Ninth Circuit's holding in Mercury was that "class members were deprived of an adequate opportunity to object to the motion itself because, by the time they were served with the motion, the time within which they were required to file their objections had already expired."  618 F.3d at 994.  That same sequence—objection deadline before a filed motion for attorney's fees—was what happened here.  As in Mercury, this schedule deprived class members of "an opportunity to object to the fee motion itself" because they had to file objections before the

32

motion was even filed.  See id. at 993–94.  As a result, this process violated Rule 23(h).[7]

Although we conclude the District Court erred by requiring class members to object before they could assess the attorney's fee motion, we hold that error does not warrant reversal under the particular facts of this case.  After receiving the notice, four class members objected.  Two of those, Mr. Price and Mr. Isaacson, made detailed arguments in opposition to the requested attorney's fee and incentive awards, including by filing opposition briefs after Dr. Muransky filed the attorney's fee motion.  Cf. Coleman v. Smith, 828 F.2d 714, 716–17 (11th Cir. 1987) (per curiam) (holding that notice of consequences of summary judgment was adequate in part because party's actions showed he understood how to respond to summary judgment motion).  The arguments made against the attorney's fee motion were considered by the Magistrate Judge and by the District Court.  And on this record, we have no reason to think other unnamed class members would have made arguments besides those made by Mr. Price and Mr. Isaacson.  Class

---

[7] The objectors also argue that the class notice did not provide class members with sufficient information to file meaningful objections to class counsel's attorney's fee request.  Mr. Price, for example, says the notice should have advised class members of the "Eleventh Circuit's 25% benchmark for attorneys' fees [or] of Class Counsel's justification for seeking a $525,000 bonus" above the 25% benchmark.  Rule 23(h) requires only that notice of an attorney's fee motion be "served on all parties and . . . directed to class members in a reasonable manner."  Fed. R. Civ. P. 23(h).  The objectors cite no authority that requires the detail they request.  Decisions about the detail in descriptions about the attorney's fees required to be included in class notice are necessarily case specific and are best left to the discretion of district courts.

members were not therefore prejudiced by the objection schedule established by the District Court. See Voeller v. Neilston Warehouse Co., 311 U.S. 531, 537, 61 S. Ct. 376, 379 (1941) (observing that "the rights of parties are habitually protected in court by those who act in a representative capacity"); see also O'Bannon v. Town Court Nursing Ctr., 447 U.S. 773, 797, 100 S. Ct. 2467, 2482 (1980) (Blackmun, J., concurring) (because nursing home had an interest in making the same arguments as absent patients, those patients' due process interests were satisfied). The District Court did not abuse its discretion by awarding attorney's fee, despite the Rule 23(h) violation.

## B. The attorney's fee award

The objectors also argue that the District Court made a mistake by awarding 33% of the class settlement fund as attorney's fees to Dr. Muransky's counsel. The District Court's approval of the attorney's fee award is reviewed for abuse of discretion. Camden I Condo. Assoc. v. Dunkle, 946 F.2d 768, 770 (11th Cir. 1991). "A district court abuses its discretion if it applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner, follows improper procedures in making a determination, or makes findings of fact that are clearly erroneous." Aycock v. R.J. Reynolds Tobacco Co., 769 F.3d 1063, 1068 (11th Cir. 2014) (quotation marks omitted). Under this standard, district courts have "great latitude" in setting fee awards in class action cases. See Faught v. American Home

34

Shield Corp., 668 F.3d 1233, 1242 (11th Cir. 2011) (citation and internal quotation marks omitted).  We conclude the District Court did not abuse its discretion.

To begin, the objectors say the District Court applied the wrong legal test to evaluate Dr. Muransky's attorney's fee request.  In their view, the District Court should have applied a lodestar analysis that multiplied the number of hours counsel worked by the prevailing hourly rate.  They claim that analysis is required by Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 546, 130 S. Ct. 1662, 1669 (2010).  In Perdue, the Supreme Court decided "whether the calculation of an attorney's fee, under federal fee-shifting statutes, based on the 'lodestar,' i.e., the number of hours worked multiplied by the prevailing hourly rates, may be increased due to superior performance and results."  Id.  The Court allowed the award of attorney's fees under a fee-shifting statute to be enhanced above the lodestar amount, but only in "rare" and "exceptional" cases.  Id. at 554, 130 S. Ct. at 1674.  Here, the objectors say the District Court should have followed Perdue because class counsel's fees would have been decided under a fee-shifting statute if the class prevailed against Godiva.  See 15 U.S.C. § 1681n(a)(3) (providing for attorney's fees "in the case of any successful action to enforce any liability" for a willful violation of FACTA).

The problem for the objectors is that class counsel sought attorney's fees from a common fund rather than under a fee-shifting statute.  See Fed. R. Civ. P.

23(h)  (authorizing courts to award attorney's fees that are "authorized by law or by the parties' agreement").  Camden I holds that "attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class."  946 F.2d at 774.  The common-fund doctrine applies to class settlements that result in a common fund even when class counsel could have pursued attorney's fees under a fee-shifting statute.  See Staton v. Boeing Co., 327 F.3d 938, 968–69 (9th Cir. 2003); Florin v. Nationsbank of Ga., 34 F.3d 560, 563 (7th Cir. 1994).  Perdue addresses fee-shifting statutes and says nothing about the award of attorney's fees from a common fund.  559 U.S. at 554, 130 S. Ct. at 1674.  Perdue is therefore not contrary to our precedent in Camden I.

In the alternative, the objectors say that the District Court misapplied Camden I by awarding 33% of the fund to class counsel.  In Camden I, this Circuit called 25% of a common fund a benchmark attorney's fee award that "may be adjusted in accordance with the individual circumstances of each case."  946 F.2d at 775.  To evaluate whether the benchmark should be enhanced, district courts can apply the twelve factors from Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717–19 (5th Cir. 1974),[8] in addition to other class-settlement specific factors.

---

[8] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981. Id. at 1209.  We recognize that the Supreme Court criticized the Johnson factors in Perdue, 559 U.S. at 550–51, 130 S. Ct. at 1671–72.  But as we've explained, Perdue arose in a different

Camden I, 946 F.2d at 775.  We have also said that the "majority of common fund fee awards fall between 20% and 30% of the fund."  Waters v. Int'l Precious Metals Corp., 190 F.3d 1291, 1294 (11th Cir. 1999).  In this case, the objectors argue the District Court misapplied the Johnson factors in awarding 33% of the settlement fund as attorney's fees.

We see no abuse of discretion in the District Court's decision.  Although the objectors "are correct that the fee award is bigger than some awards in other suits[,] . . . that does not mean the award is too big."  Birchmeier v. Caribbean Cruise Line, Inc., 896 F.3d 792, 796 (7th Cir. 2018).  The Magistrate Judge's R&R concluded that the Johnson factors supported the request for a fee above the 25% benchmark.  That conclusion was based on weighing nine Johnson factors in favor of the enhanced award, including, by way of example, "the novelty and difficulty of the issues" and "the results obtained."  After considering the objections to the R&R de novo, the District Court reached the same conclusion that "the requested attorneys' fees are reasonable under the Johnson/Camden I analysis."[9]  The District Court found that the settlement "confers substantial benefits" on class members.  The District Court's order also emphasized "the results obtained," saying the class

---

context (fee-shifting statutes), and we are bound to apply our precedent in Camden I and Johnson to this common fund.

[9] The District Court gave no weight to the Magistrate Judge's characterization of Mr. Price and Mr. Isaacson as "professional objectors."  We don't either.

members who submitted claims "will receive cash payments that represent a significant portion of the damages that would be available to them were they to prevail in an individual action." The District Court elaborated on these points at the fairness hearing. There, the court discussed the significant legal hurdles class counsel faced, including the possibility that the Supreme Court would hold in Spokeo that risk of identity theft could not support standing. The court explained the difficulty of proving willfulness, and its own skepticism that the evidence would support a willfulness finding in this case.

The District Court properly assessed the risks faced by the class and the compensation secured by class counsel. Under the circumstances, the District Court did not abuse its discretion by awarding an above-benchmark percentage of the common fund. The attorney's fee award is therefore affirmed.

## C. The incentive award

Finally, the objectors challenge the $10,000 incentive award the District Court approved for Dr. Muransky as class representative. A district court's decision to grant an incentive award to a named class representative is reviewed for abuse of discretion. Hadix v. Johnson, 322 F.3d 895, 897 (6th Cir. 2003).

The objectors make two arguments on appeal. First, Mr. Isaacson argues incentive awards are prohibited in common-fund settlements. Second, the objectors jointly challenge the $10,000 award as too large because they say Dr.

Muransky put little personal time and effort into the litigation. We reject both arguments.

Relying on two common fund cases, Mr. Isaacson says litigants who secure a common fund can recover reasonable attorney's fees and litigation expenses but cannot recover incentive awards for their own services. See Central R.R. & Banking Co. v. Pettus, 113 U.S. 116, 122, 5 S. Ct. 389, 390 (1885); Trustees v. Greenough, 105 U.S. 527, 538 (1882).

We are not persuaded by this argument. Many circuits have endorsed incentive awards and recognize them as serving the purposes of Rule 23. See, e.g., Staton, 327 F.3d at 975–77; Hadix, 322 F.3d at 897–98. No circuit has applied Greenough or Central Bank, which were decided well before the adoption of Rule 23, to prohibit incentive awards in the class-action context. We do not view granting a monetary award as an incentive to a named class representatives as categorically improper.

At the same time, there are limits to an appropriate incentive award. In Holmes v. Continental Can Co., 706 F.2d 1144 (11th Cir. 1983), the class settlement awarded the class representatives different amounts than the unnamed class members because class counsel estimated that the named representatives had meritorious claims. Id. at 1148–49. This Court held that "[w]hen a settlement explicitly provides for preferential treatment for the named plaintiffs in a class

39

action, a substantial burden falls upon the proponents of the settlement to demonstrate and document its fairness." Id. at 1147. We said that "a disparate distribution favoring the named plaintiffs requires careful judicial scrutiny into whether the settlement allocation is fair to the absent members of the class." Id. At the same time, we recognized that "the inference of unfairness" associated with unequal distributions "may be rebutted by a factual showing that the higher allocations to certain parties are rationally based on legitimate considerations." Id.

Like the settlement distribution in Holmes, incentive awards "provide[] for preferential treatment for the named plaintiffs," see id. at 1147, and create a similar possibility of collusion between class representatives, their counsel, and defendants. See id. at 1148; Hadix, 322 F.3d at 897 ("[I]ncentive awards are scrutinized carefully by courts who sensibly fear that [they] may lead named plaintiffs to expect a bounty for bringing suit or to compromise the interest of the class for personal gain."). As a result, we hold that incentive awards must be supported by "legitimate considerations" sufficient to "dispel the cloud of collusion which such a settlement suggests." See Holmes, 706 F.2d at 1147 (quotation marks omitted).

The parties dispute what those considerations should be. The objectors focus on the time and money actually spent on the case by the named representative while Dr. Muransky argues that the value of the settlement to the

40

class members is most important. We see no reason to limit the discretion of district courts to consider the justifications proposed by either party. Indeed, we are aware of a number of justifications regularly cited in support of incentive awards. For example, incentive awards may be given "to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, . . . to recognize their willingness to act as a private attorney general," Rodriguez v. W. Publ'g Corp., 563 F.3d 948, 958–59 (9th Cir. 2009), and to "induce an individual to become a named plaintiff," Montgomery v. Aetna Plywood, Inc., 231 F.3d 399, 410 (7th Cir. 2000). Although these considerations will certainly weigh differently in different cases, together they "help illuminate the fact that class representatives . . . have typically done something the absent class members have not—stepped forward and worked on behalf of the class." 5 Newberg on Class Actions § 17.3. All of these justifications are legitimate, and district courts may exercise their discretion to determine whether they favor an incentive award in any given case.

Here, the District Court awarded Dr. Muransky $10,000 "for his efforts in this case." It is not clear what the District Court meant by that. Even so, we find that the record supports the incentive award. See Friends of the Everglades v. S. Fla. Water Mgmt. Dist., 678 F.3d 1199, 1201 (11th Cir. 2012) (explaining that a district court abuses its discretion when "neither the . . . decision nor the record

41

provide sufficient explanation to enable meaningful appellate review" (emphasis added)); Cox Enters. v. News-Journal Corp., 510 F.3d 1350, 1361 (11th Cir. 2007) (finding no abuse of discretion in district court's decision not to award prejudgment interest based on the record).  At the District Court, Dr. Muransky argued that an incentive award was justified by the size of the settlement.  As previously discussed, the District Court found that the class settlement "confers substantial benefits" on the class members.  And at the fairness hearing, the District Court observed that Dr. Muransky "was subjecting himself to inconvenience and time delays that didn't materialize as much as they might have, but they still were a possibility when he signed on as the class representative." These statements give meaning to the court's $10,000 incentive award to Dr. Muransky "for his efforts in this case." [10]  We therefore hold that the District Court did not abuse its discretion by granting this incentive award.

**AFFIRMED**.

---

[10] By our calculation, Dr. Muransky's incentive award had little impact on the class members' recovery.  Assuming 48,000 class members submitted valid claims (a high-end approximation) for the $4.2 million in the fund for distribution, Dr. Muransky's incentive award of $10,000 resulted in a reduction of about 21 cents in the recovery of the class members who filed claims ($87.50 vs. $87.29).

JORDAN, Circuit Judge, concurring:

I join Judge Martin's thorough opinion for the court. I write separately to note that Mr. Isaacson, a class member and one of the appellants, may lack Article III standing to challenge the Article III standing of Dr. Muransky, the named plaintiff and class representative.

As a member of the class, Mr. Isaacson did not just file objections to the proposed settlement; he chose not to opt out and submitted a claim for compensation pursuant to the settlement agreement. Given that the proposed settlement fund totaled $4.1 million after attorney's fees, and that approximately 47,000 class members filed claims, Mr. Isaacson stands to receive about $85 even if his arguments about the attorney's fees and the incentive award fail. Although that sum is not a king's ransom, there is no doubt that Mr. Isaacson is going to realize some financial benefit from the settlement.

Article III's standing requirements—injury-in-fact, causation, and redressability—persist "throughout the life of [a] lawsuit." *Wittman v. Personhuballah*, 136 S. Ct. 1732, 1736 (2016). As a result, standing "must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance." *Hollingworth v. Perry*, 570 U.S. 693, 705 (2013) (citation and quotation marks omitted). Because "standing is not dispensed in gross," it seems to me that Mr. Isaacson "must demonstrate standing for each claim he seeks

43

to press and for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (citation and internal quotation marks omitted). If Mr. Isaacson "lacks standing to bring [a certain claim on] appeal, we lack jurisdiction over [that claim] and must dismiss it." *Tenille v. Western Union Co.*, 809 F.3d 555, 559 (10th Cir. 2015).

Mr. Isaacson certainly has standing on appeal to pursue his challenges to the deadline set by the district court for objections to the proposed settlement, to the attorney's fees awarded to counsel for the plaintiffs, and to the incentive award given to Dr. Muransky. An incorrect deadline could have certainly affected Mr. Isaacson's ability to assert objections to the motion for attorney's fees, and any decrease in the attorney's fees or the incentive award would be redistributed among the class members, potentially increasing Mr. Isaacson's own monetary recovery. But Mr. Isaacson has also challenged Dr. Muransky's standing to bring a FACTA claim in the first place, and it is with respect to that challenge that his standing is at best doubtful.

According to Mr. Isaacson—who happens to be a plaintiffs' class-action attorney—Dr. Muransky did not suffer an injury that allows him to bring a claim under FACTA because he "fail[ed] to allege that his credit suffered when he was handed a receipt with a few extra digits, or that anyone else knew of the violation or was in a position to take advantage of it to his injury." Br. for Mr. Isaacson at

44

34.  In a recent law review article that he authored, Mr. Isaacson explained his motivation for challenging Dr. Muransky's standing in the following way: "I was troubled by the notion that a class representative who suffered no injury should be able to evade the burden of demonstrating his own Article III standing . . . when entering [into] a class-action settlement that purports to release other class members' claims for actual damages."  Eric Alan Isaacson, *A Real-World Perspective on Withdrawal of Objections to Class Action-Settlements and Attorneys' Fees Awards: Reflections on the Proposed Revisions to Federal Rule of Civil Procedure 23(E)(5)*, 10 Elon L. Rev. 35, 51 (2018) (footnotes omitted).

I do not doubt the sincerity of Mr. Isaacson's convictions, but it might fairly be said that one could be just as troubled by the notion that an appellant who suffered no injury from a judgment should be able to seek reversal without demonstrating that he has been injured by that judgment and has Article III standing. After all, the desire to ensure compliance with the law affects only the "generalized interest of all citizens in constitutional governance."  *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 217 (1974).  *See also Hollingsworth*, 570 U.S. at 704 ("The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art[icle] III's requirements.").

Mr. Isaacson, as noted, stands to gain financially from the settlement. How, then, can it be said that Mr. Isaacson suffered any cognizable harm (aside from his arguments as to the deadline for objections, the attorney's fees, and the incentive award) from the institution of the lawsuit by Dr. Muransky and/or the consummation and approval of the settlement which provided him with a tangible benefit? If Mr. Isaacson thought that the action brought by Dr. Muransky on behalf of a class did not constitute a justiciable case or controversy under Article III, why did he not simply opt out and let the statute of limitations expire on any FACTA claim he might have had individually? Conversely, if Mr. Isaacson thought that he (unlike Dr. Muransky) had Article III standing to assert a FACTA claim and believed that he could do better as an individual litigant, why did Mr. Isaacson not simply file suit on his own against Godiva?

Stated differently, if Mr. Isaacson prevailed on his standing argument, I do not see how we could redress any injury he has suffered. *See Wittman*, 136 S. Ct. at 1732 (dismissing appeal by intervenors who could not explain how their alleged injury would be redressed by a favorable judicial decision). Indeed, Mr. Isaacson will cause himself injury if he succeeds because his monetary recovery—along with that of every class member—will be wiped out. For if Dr. Muransky has not suffered an Article III injury, he does not have standing to sue Godiva under FACTA, and that means that the entire case must be dismissed for want of a

46

justiciable case or controversy. *See generally* William B. Rubenstein, 1 Newberg on Class Actions § 2:8 (5th ed. June 2018) ("[I]f a case has only one class representative and that party does not have standing, then the court lacks jurisdiction over the case and it must be dismissed.").

The rule against permitting appeals by prevailing litigants is a prudential one, but a litigant who obtains a favorable judgment must nevertheless have a personal stake to appeal. *See generally Camreta v. Greene*, 563 U.S. 692, 701-02 (2011). In an appropriate case, we may need to address whether a class member like Mr. Isaacson has standing on appeal to challenge the standing of a class representative who obtained a settlement providing economic benefits to the entire class. *Cf. King v. Cessna Aircraft Co.*, 505 F.3d 1160, 1165 (11th Cir. 2007) ("if the requirements for appellate jurisdiction are not met 'we cannot review whether a judgment is defective, not even when the asserted defect is that the district court lacked jurisdiction'") (citation omitted).